# NICHOLAS RITZMAN

## *v.*

# THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa May 19, 1884.*

1. CRIMINAL LAW—*encouraging commission of unlawful act, resulting in homicide—liability for consequences.* Several persons of a party passing along a highway got out of the wagon in which they were traveling and went into an orchard without permission. The owner ordered them to leave, which they refused to do, when others from the wagon entered the orchard, armed with clods of dirt, and assaulted the owner, using very offensive language to him, and one of the party struck the owner, with a clod, upon the back part of the neck, felling him to the ground, from which blow death ensued in a few minutes. It appeared that one of the intruders, who was tried separately, took a part in the affray, and tried to kick the deceased while lying prostrate from the blow. It was *held*, that it was not necessary to show that he threw the missile which caused the death, in order to sustain his conviction for manslaughter. It was sufficient that he was present, encouraging the perpetration of the offence, to make him equally guilty with the party who struck the fatal blow.

2. EVIDENCE—*exclamation of one of several persons who had committed an unlawful act.* Several persons, including one who was put upon trial for murder, while traveling along the road entered an orchard by the road side, when, without justification, in a difficulty with the owner, who had ordered them to go out of his orchard, some one of the party, by a blow with a clod, killed the owner, and they all then got into the wagon and started toward their homes. A party in pursuit of them, seeking to have them arrested, passed the wagon, when some one of them called out, "Hello, good-looking fellow!" or something like that, but such witness so addressed could not say the defendant was in the wagon at that time. It appeared, however, from the defendant's own testimony, that he did not get out of the wagon until after they reached the next point where they stopped: *Held*, that the court properly refused to strike out of the testimony the words so spoken to the witness.

3. SAME—*cross-examination—latitude allowed.* Great latitude should always be allowed in cross-examination, especially in a capital case, and the court should never interpose except where there is a manifest abuse of the right.

4. Where a witness, on a second examination as to a particular transaction, states an important fact omitted in his previous account of the matter, his attention, on cross-examination, may properly be called to the fact, and he be required to explain why the omission was made in his first statement.

5. So, on the trial of one for murder, the death having been caused by a blow with a clod from the hand of some one of several trespassers, a witness who was present at the time of the killing, stated, on his examination in chief, that the defendant then being tried, during the transaction called the 'deceased "a son of a bitch,"—on cross-examination the witness was asked if in his former examination he had made any such statement as that. On objection, the court below held that the inquiry should be limited to the questions actually asked and the answers given in the former examination, and that the question was improper: *Held,* that the rule laid down by the court was rather stringent. The inquiry might well be made, with the view to ascertain the motive of the witness in omitting the statement on his examination in chief, in case it should turn out he had done so.

6. ERROR WILL NOT ALWAYS REVERSE—*exclusion of evidence.* Although the court, on the trial of a cause, may err in the exclusion of evidence, or in refusing to allow certain questions to be put on cross-examination, yet if this court is fully satisfied, under the facts of the case, that the error could not have affected the result, the error will afford no ground of reversal.

7. INSTRUCTIONS—*whether sufficient as a whole.* It being impracticable to require absolute, literal accuracy in instructions, it is therefore sufficient if the instructions, considered as a whole, substantially present the law of the case fairly to the jury.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. T. A. MORAN, Judge, presiding.

Messrs. MOORE & PURNELL, for the plaintiff in error:

There was error in admitting proof of the words of some one in the wagon, to Barry, when he passed the party. *Devine* v. *The People,* 100 Ill. 290.

The evidence shows that several persons were present, not acting in concert, and that some one of them threw the clod. In the absence of proof as to who did the fatal act, all must go acquit. Wharton on Crim. Evidence, 3, note; *The People* v. *Moody,* 15 Cal. 289; *Campbell* v. *The People,* 16 Ill. 17; *Commonwealth* v. *Riley & Stewart,* Thatcher's Crim. Cases, 471.

Before Ritzman is responsible for the act of the person who struck the blow causing the death, something must be shown in his conduct indicating a design to encourage or incite the doing of the act. 1 Wharton on Crim. Law, sec.

211, note 1, and cases; 1 Hale, 439; Foster, 350; *Connaughty* v. *The State*, 1 Wis. 169; *The State* v. *Farr*, 33 Iowa, 553; *Clem* v. *The State*, 33 Ind. 418; 42 id. 420.

No matter whether Ritzman was present at the homicide' of Lovett willfully or unexpectedly, such mere presence can not make him liable for the act. Nor would it even if he knew it was being done, and passively consented thereto. *Clem* v. *The State*, 33 Ind. 418; *Wade* v. *The State*, 71 id. 535; Wharton on Crim. Law, sec. 214, note 5; *Butler* v. *Commonwealth*, 2 Duv. 435; *Plummer* v. *Commonwealth*, 1 Bush, 76; *The People* v. *Ah Ping*, 27 Cal. 489; *The People* v. *Woodward*, 45 id. 493; *King* v. *The State*, 21 Ga. 220; *Walrath* v. *The State*, 8 Neb. 80; *White* v. *The People*, 81 Ill. 333; 4 Ga. 465; 65 Mo. 29; 12 Wis. 532; 6 Texas App. 23; 40 Ill. 488.

If the defendant had coöperated in any general felonious plan, or any plan in which a collision might reasonably have been expected, he would be liable; in the second degree at common law, and the first degree by our statute, to any crime committed as the result of and in the execution of the plan, and not otherwise. Wharton on Crim. Law, secs. 213, 214, 220, 397, 1404; Wharton on Crim. Evidence, sec. 440; *Lamb* v. *The People*, 96 Ill. 76; 72 id. 303; 6 Jones, (N. C.) 21; 7 Iowa, 350; 6 Texas App. 23.

But such participation must be concerted. Wharton on Crim. Law, sec. 213; Stephens on Crim. Law, 27; *Rex* v. *Manners*, 7 C. & P. 801; 1 Chitty on Crim. Law, *258; *Commonwealth* v. *Knapp*, 9 Pick. 496; *Norton* v. *The People*, 8 Cow. 137; *Breese* v. *The State*, 12 Ohio St. 146.

And even where parties confederate to do a certain thing, no one is liable for the acts of another, who acts independent of the general plan. Thus, if they are disturbed, and escape, and one commits a homicide, he alone must answer. *Rex* v. *Collins*, 4 C. & P. 565; *Rex* v. *Howell*, 9 id. 437; Wharton on Crim. Law, sec. 214, note 1, p. 244.

Confederates in a riot are not responsible for collateral collisions in no way contemplated or encouraged by those not actively engaged in such collisions.   Wharton on Crim. Law, sec. 214, note 4; *Rex* v. *Murphy,* 6 C. & P. 103; *Rex* v. *Skeet,* 4 F. & F. 941; *Rex* v. *Price,* 8 Cox's C. C. 96; *United States* v. *Jones,* 3 Washb. 209; *Commonwealth* v. *Campbell,* 7 Allen, 541; *Watts* v. *The State,* 5 West Va. 532; *The State* v. *Calcup,* 1 Ired. 30.

Mr. LUTHER LAFLIN MILLS, and Mr. CHARLES B. MORRISON, for the People:

The joint responsibility of rioters for each other's misconduct rests on the principle that when an act is committed by a body of men engaged in a common enterprise, such act is treated as if specifically committed by each individual. Wharton on Homicide, (2d ed.) sec. 201.

The mere presence of rioters may make one responsible for the acts of all the rioters, provided he was a member of the rioting party.   Wharton on Homicide, (2d ed.) sec. 203.

Individuals who, not specifically parties to the killing, are present, and consenting to the assemblage by whom it is perpetrated, are all guilty of the crime.   1 Wharton on Crim. Law, (8th ed.) sec. 396.

Bishop lays down the law in this manner:   "Where death is unintentionally inflicted by rioters, who use deadly missiles, as, where one throws a stone at random, whereby a man is killed, all are guilty of murder."   2 Bishop on Crim. Law, (9th ed.) sec. 691.

We call the court's attention to the section of our statute on accessories.   Rev. Stat. Crim. Code, sec. 274.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

The plaintiff in error, Nicholas Ritzman, and William Spies, were indicted in the Criminal Court of Cook county, at its September term, 1883, for the murder of Charles Lovett.

At the following December term Ritzman was tried separately, before the court and a jury, upon said charge. The trial resulted in his conviction for manslaughter, the jury fixing the term of his confinement in the penitentiary at eight years. The usual motions for a new trial and in arrest of judgment having been made, considered and overruled, the court thereupon entered final judgment in pursuance of the verdict, to reverse which Ritzman has brought this writ of error.

The errors assigned question the rulings of the court upon questions of evidence, and upon the giving and refusing of instructions. It is also claimed the evidence is insufficient to sustain the conviction, and a reversal is asked on these several grounds.

The circumstances under which the homicide occurred are as follows : About five o'clock in the afternoon of August 5, 1883, the accused, together with ten other young men, were returning to Chicago, by way of Grand avenue, from a picnic which they had attended that day on the Desplaines river, and when within some ten or eleven miles of their destination they came opposite the premises of the deceased, on the north side of the avenue. Here some of the party left the express wagon in which they were traveling, and entered an uninclosed apple orchard, being a part of said premises. The dwelling of the deceased was about twenty feet north of the road, and on the west side of the orchard. Just at this time the deceased was passing from his house through the orchard, in an easterly direction, when he encountered those of the party who had entered the orchard. Upon discovering them he ordered them off the premises, which attracted the attention of those who remained outside, whereupon others of the party, arming themselves with hard clods of earth, also entered the orchard, going in the direction of the deceased. Mrs. Lovett, and a young man by the name of Barry, who was boarding with the deceased at the time, being in-

formed of the difficulty by the children of the deceased, left the house and proceeded in haste to where the parties were, Barry being somewhat in advance. He swears, in substance, that when he got there he saw a clod, or what he supposed to be a clod, bound off Lovett's shoulder; that he then ran to Lovett as fast as he could, and as he came up to him Lovett fell; that Spies being nearest to the deceased, witness "made for him," when the former stepped back and struck at witness; that at this juncture of affairs witness discovered Ritzman, the accused, standing near or over deceased, and in the act of kicking him, when witness jumped over and shoved Ritzman back; that Lovett died in about five minutes after he fell; that witness saw as many as three of the party in the orchard, and there might have been more; that they used profane and foul language both to the deceased and witness; that witness next morning picked up a clod of dirt close to where Lovett lay the evening before; that the party having proceeded on their way, were pursued and overtaken, and all arrested that evening, except the accused and one other, who succeeded, for the time being, in eluding arrest.

The testimony of Mrs. Lovett is substantially the same as Barry's, so far as the transaction in the orchard is concerned. She positively identifies the defendant as being in the orchard at the time her husband was killed, and actively participating in what was done. She says: "Defendant was trying to kick my husband after he fell. Barry was standing near my husband, and he pushed this young man (referring to the accused) back when he tried to kick my husband while he lay on the ground, dead; I saw other persons there, but his face is the only one I looked at that I recognize. * * * While defendant stood over my husband he called him a God damned son of a bitch, and tried to kick him at the same time. I *looked* him in the face and said, 'you have killed him.' He looked at me. I heard some one say, 'you have killed a man,' and he started and ran." Mrs. Lovett also

identifies two clods of dirt as having been picked up near where her husband lay, which were produced in court on the trial, and with which the medical testimony shows the wounds causing Lovett's death might have been produced. She also locates the wounds from which he died, on the right side of the neck, back of his ear, and Dr. Bluthardt swears that Lovett died from the wounds described by her.

Cleaver, one of the party, admits he was in the orchard, and says the accused was there also, and near the deceased when he fell, though he did not see the deceased receive any blow. He further says when they returned to the wagon and got into it, Spies remarked: "My first one didn't count, but my second one did." To which Ritzman replied: "My second one counted; my first one didn't hit, and my second one counted." To which Spies rejoined: "Will you stick to that?" and Ritzman said he would. The witness, on cross-examination, states that he understood from this conversation that Spies and Ritzman had thrown something at Lovett.

The case thus made by the People is met almost exclusively by the simple denial of the accused, who testified on his own behalf. The defendant himself admits he was present when Lovett was killed; that his death occurred at the time and place fixed by the other witnesses, and also that it was caused by a blow given by one of the party to which he belonged, without any excuse or justification whatever. He further admits that he, in company with Cleaver, without any authority entered the orchard of the deceased for the purpose of getting apples, and that they were ordered out by Lovett. So far there is no material controversy. The accused, however, claims that when he and Cleaver were ordered out of the orchard, Spies jumped out of the wagon, picked up two lumps of dirt and threw them at the deceased, the first one missing him and the second taking effect and causing his death, as stated by the other witnesses. While he denies the language attributed to him by Cleaver in the conversa-

tion which occurred after the parties had returned to the wagon, with respect to throwing at the deceased, yet he admits there was such a conversation, but claims that it was between Spies and Cleaver, and not between Spies and himself.  He also corroborates the statement of Barry to the effect that Spies assaulted Barry while in the orchard.   Thus it will be seen the case made by the People, in several essential features, is greatly strengthened by the testimony of the defendant himself.   There is other evidence we have not commented upon, or even so much as adverted to, for the reason we do not consider it of sufficient importance to demand special notice.   Taking it as a whole, we think the evidence not referred to rather strengthens the case made by that part of the testimony specially noticed.

From the foregoing outline it satisfactorily appears that on the 5th of August, 1883, while the deceased was at home, quietly and peaceably attending to his own affairs, his premises were unlawfully invaded by a party of trespassers, the accused being one of the number; that when ordered off the premises, instead of leaving, as they should have done, they set upon him, and wantonly slew him in the presence of his own family, without a shadow of justification or excuse,—and yet we are told there can be no conviction in this case, because the evidence does not show, beyond a reasonable doubt, the very hand that hurled the fatal missile which sent him into eternity without a moment's warning.   So far as the accused is concerned, under the proofs in this case we think it wholly immaterial whether the missile in question was thrown by the hand of the accused or of some one of his co-trespassers.   That the defendant was present,—and, to say the least of it, encouraging the perpetration of the offence,— can not be denied, unless we are prepared to set aside the testimony of Mrs. Lovett and Barry, two wholly disinterested witnesses, and accept the unsupported statements of the accused, which, of course, we can not do.   And if the defendant

was so present encouraging the perpetration of the offence, it is hardly necessary to say that by the express provisions of our statute he is made a principal, and equally guilty with the one who personally gave the fatal blow. Both these witnesses, as we have already seen, swear positively he was not only present, using abusive, profane and obscene language, but even after the deceased was knocked down, and while in a dying condition, Barry had to interpose to prevent the defendant from kicking his prostrate form,—and yet we are, in effect, asked to say he was not present aiding or encouraging the offence. This we can not do.

It appears that Barry, as already stated, immediately after the homicide, went in pursuit of the party, passing them on the way, some fifteen minutes afterwards, between Lovett's and Whisky Point, where the arrest was made. Witness says all of the party that he saw were in the wagon when he passed them, but he could not say that he noticed the defendant, or whether he was in the wagon or not; that in passing, one of the party hallowed out, "Hello, good-looking fellow!" or something like that. The court was asked to strike this out of the testimony and exclude it from the jury, on the ground it did not affirmatively appear the accused was present, which the court refused to do, and this is assigned for error. There is no error in the ruling of the court on this question. The evidence clearly shows that the accused got into the wagon at Lovett's, and he swears himself that he was with the party, and got out of the wagon at Whisky Point, so that he must have been present when the language complained of was used. There is nothing in the objection. Indeed, it seems frivolous.

The next objection relates to the exclusion of evidence. Barry having stated, on his examination in chief, that Ritzman, during the altercation in the orchard, called Lovett a "son of a bitch," was asked, for the purposes of impeachment, if, in his former examinations, he had made any such

a statement as that. On objection by the People, the court ruled, in effect, that the inquiry should be limited to the questions actually asked and the answers given in the former examinations, and that the question, therefore, in the form put, was improper. We are of opinion the rule, as laid down by the court, is rather stringent. Great latitude should always be allowed in cross-examination, especially in a capital case, and the court should never interpose, except where there is a manifest abuse of the right. The right of cross-examination is justly esteemed one of the most efficient means of eliciting the truth, and of exposing fabrication and falsehood. We think, where a witness, on a second examination, as to a particular transaction, states an important fact omitted in his previous account of the matter, his attention, on cross-examination, may properly be called to the fact, and he be required to explain why the omission was made in his first statement. If, in such case, the fact in question was forgotten, or omitted through inadvertence, and the attention of the witness was not directed to it, as it often happens, the witness, of course, would so state, and that would end the matter. But if the discrepancy was intentional, the cross-examination, as a general rule, would develop the fact, and in such case it would, and properly should, affect the witness' credit before the jury. While we think, as already indicated, the ruling of the court on this subject was not sufficiently liberal, yet we are fully satisfied, under the facts in this case, the error in question could not have affected the result, and it therefore affords no ground for reversal.

One or two other objections of a similar character are made by plaintiff in error, which, for the reason just stated, must be disposed of in the same way.

Numerous exceptions have been taken, and elaborately argued, to the instructions of the court, most of which we regard as highly technical, and affording no reason for a reversal or even just criticism. It has often been said, and

we repeat here, that to require absolute, literal, technical accuracy in instructions, would, as a general rule, defeat the ends of justice, and bring the administration of the criminal law into disrepute and just contempt.   It is sufficient when the instructions, considered as a whole, substantially present the law of the case fairly to the jury.   That, we think, has been done in this case.   The criminal laws of this State must be enforced.   And if it is not already understood, it is high time it should be, that where a case is clearly made out against the accused, and the jury have so found, this court will not reverse for a mere technical error, which it can see could not have affected the result.

The judgment will be affirmed.

*Judgment affirmed.*