**People of the State of Illinois, Plaintiff-Appellee, v. James Bracey, Defendant-Appellant.**

**Gen. No. 52,059.**

First District, Second Division.

May 20, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (John J. Van Zeyl and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Haddad, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

The defendant was indicted for murder. He was tried by the court without a jury, found guilty and sentenced to 14 to 20 years in the penitentiary.

The facts are substantially as follows. On March 7, 1966, a group of boys (numbering from 4 to 11, depending on whose account is believed), aged 15 or 16 years, had gone to the apartment of Emmett Tate, at the in-

vitation of his stepdaughter, Wanda Gray. Shortly after they arrived, at about 8:40 p. m., Emmett Tate came into the apartment and ordered the boys to leave, which they did. One of the group went back into the apartment to get a jacket he had left there, and when he came out to where the rest of the boys were congregated he told them Wanda's stepfather was beating her; that they should go back and stop him. There is a dispute in the evidence as to whether at this point one of the group did or did not ask another for a gun. There is also a dispute as to which of the boys returned to the apartment, but it is not disputed that the defendant was one who did.

They told Tate to stop beating Wanda, and he told them to stay out of his family affairs. When he started backing down the hallway the boys began beating and fighting him, and when he turned to go down another hall, a shot was fired into his head, causing his death. The entire group, including Wanda Gray, then ran out and went to the home of one of them, after which they were picked up by the police while on the way to another boy's home. The boy who had the gun in his possession was placed in the detective's car, and the remainder of the group was placed in a squadrol.

There is some variance in the testimony as to the details of the killing. Wanda Gray testified for the State that she was 15 years old; that when the boys returned to the apartment James Bracey, defendant, was at the head of the group and that it was he who took out the gun and shot her stepfather. She stated that Bracey took her along when he left the apartment. She had first told the police that Bernard Sutton had fired the gun, but explained that version by saying that when she was in the squadrol with the defendant and the others, the defendant had told her that if the police asked who did the shooting she should say it was Sutton because he was younger and would not get as much time as the

330

defendant. She had also previously told the police that she was unconscious at the time of the shooting; at the trial she stated that the truth was she was on the floor when the boys returned to the apartment; that she then got up and the fight developed; that she was standing right behind the entire pack during the fight; that there were four boys in the apartment at that time and she could see all of them clearly; that Sutton was not one of the four; and that she saw Bracey shoot her stepfather. The witness further testified that James Amos was not present at the time of the killing and that Sutton was not present at the Bracey home afterwards when some of the group went there. She explained her original story about her unconsciousness at the time of the shooting incident by saying that Bracey had asked them all not to say he did it, and since she did not want to lie about it at first she just said she was unconscious; that she changed her story because she did not have enough injuries to substantiate the claim that she was unconscious.

Bernard Sutton testified that he and George Coles had first gone to the Tate apartment about 6:00 p. m., had stayed for about 15 minutes, then left, and that he returned about 8:00 p. m., at which time he saw James Bracey, George Coles, Robert Lindsey, Herman Cunningham and Dennis Malone, "and a few more" boys. When Tate came in and told them to leave, they all went out, but Coles and Bracey went back to get a coat which had been left in the apartment. Bracey came back out and told Coles to give him the gun; the others tried to dissuade Coles, but he gave the gun to Bracey who ran back into the apartment. All the other boys went back in with the exception of Sutton and Lindsey, who stood outside looking into the apartment, watching the boys beating Emmett Tate. Sutton testified that he saw Bracey with the gun, then heard a shot; that he did not actually see Bracey fire the gun, but that later, when they

were in the hallway at 4500 South State Street, Bracey told Sutton he had shot Tate in the leg. Sutton stated that Bracey wiped the fingerprints off the gun and gave it to Dennis Malone, who had it in his possession when the police stopped them.

Bernard Sutton further testified that although he was not sure, he thought that James Amos was not in the apartment at the time of the shooting. At one point Sutton contradicted himself by saying that after Bracey returned to the apartment the second time, a couple seconds afterward "Dennis Malone, Herman Cunningham, and Donnie Puckett, and me and Robert Lindsey was on the gallery, standing in front of the door." He stated that he saw Wanda get up from the floor and that she was in the hallway at the time of the beating and the shooting. At the police station Sutton had said that Frank Tate, the son of Emmett Tate, had "touched" Sutton, thereby indicating that he was the person who had shot the father.

Robert Lindsey testified that he heard someone say "give me the gun" before he went into the apartment, but he did not know who had said it. He stated that he and Sutton were on the gallery at the time of the shooting. The gallery is outside the building, separated from the hallway by a door, and from the gallery one can apparently see into the apartment. Lindsey said he saw three or four boys fighting with Tate; that he did not see a gun, but that he heard a shot.

A police officer testified that when he apprehended Malone on the northwest corner of 51st Street and Prairie Avenue, five others were present: Wanda Gray, George Coles, James Bracey, Herbert Cunningham, and Donnie Puckett, all of whom were placed in the squadrol. The officer said it was customary practice for one of the officers to ride in the back with the prisoners, but that he did not know whether an officer rode with them in this instance. It was during this time, according to the

332

testimony of Wanda Gray, that the defendant told her to tell the police it was Sutton who had done the killing.

James Amos, a cousin of the defendant, testified that eleven people were present in the apartment when Tate came home and told them to leave. He stated that George Coles had left his coat in the apartment and had come back saying that Wanda's father was "stomping" her; that eight of the group (not four, as testified to by the State's witnesses), including Sutton, went back into the apartment. After a short period of fighting with Tate, someone yelled "Let's get out of here," and everyone started running out except Amos, who had almost tripped over Wanda who was lying on the floor. Amos stated that he looked back and saw Sutton holding his stomach as if he were going to throw up; "Then I looked to see if he had a gun. So when Jean [Wanda] started to hollering, I turned around again, because I thought her old man came out from the back. And then I seen—I heard the shot fired. Was nobody standing there but me—"

Edward Malone (brother of Dennis) also testified that Amos wɛ ʒ present; that it was Sutton who had left his coat in the apartment, and who informed the group that Tate was beating Wanda. Malone further testified that Sutton went back into the apartment with the rest of them and that Wanda was on the floor and did not get up. Malone said ". . . we was on our way out the door, and I heard a shot. I saw Bernard with the gun." According to Malone's testimony, Wanda was outside the apartment at the time the shot was fired, and the defendant was not in the apartment.

Frank Tate, son of the deceased, who had purportedly pointed out Sutton as the killer of his father, testified that on the date in question he was 11 years old; that when his father was whipping his sister, "a boy came in and had a gun and ran to the back, and a whole bunch of more boys, and then I got up and ran out

to call the police." Frank said he thought the person with the gun was Sutton. He further testified that on the day in question both Sutton and the defendant were wearing long dark coats, and that the defendant was in the apartment when Frank left to call the police. He had not looked out on the gallery to see if anyone was there.

James Bracey, defendant, testified on his own behalf that on March 7, 1966, he was with Coles and Sutton in a restaurant when Coles called Wanda Gray and asked if they could "have a little get-together. So she replied yes, and she said, 'You can come up my house about 8:00 o'clock or 8:30. My mother is gone to school and my father is in Michigan City.' So we said okay." The defendant stated that he later went to the Tate apartment by himself and when he arrived he found the following boys there: Bernard Sutton, George Coles, Dennis Malone, Edward Malone, James Amos, Donnie Puckett, Larry Swatsy, Calvin (Bernard Sutton's cousin), Herman Cunningham, "a boy named Snake and another boy," Wanda Gray, and her little brother. The witness testified that a short time later Wanda's stepfather, Emmett Tate, came in and ordered them all out of the apartment. They left, but someone who had gone back for his coat returned and said Tate was beating Wanda and they should go in and stop him. According to the defendant's testimony, ten or twelve boys then went back into the apartment and began fighting with Tate. The defendant admitted hitting Tate, and said that when someone yelled that the police were coming, they all ran to the door. He said he was letting people out of the door when he heard a shot; that he looked around and saw Bernard Sutton standing by the bathroom door with the gun in his hand; that he saw Bernard fire the gun; that Wanda was lying on the floor throughout this episode, and that he had never told her he had shot her stepfather. He further denied having had any other conversation with

her in the squadrol, and said he did not tell her he was going to accuse Sutton of the shooting because he was 15 years old. According to the defendant's version, Amos was present in the apartment at the time of the shooting.

Mrs. Bertha Tate testified that it was not possible for a person standing at the apartment door to see anyone standing in or near the bathroom door, which contradicted defendant's testimony that he saw Sutton standing at the bathroom door while defendant was at the apartment door.

After the defense rested the trial court made the following comment:

> All right. I have a reasonable doubt as to whether or not this defendant fired the fatal shot. However, I have no reasonable doubt, backed by his own words and the testimony of his witnesses, Edward Malone and Frank Tate, that there was a man, the deceased in this case, who was in his own home, who ordered them to leave, they did leave, and he began to chastise his own daughter. According to the defendant, someone said, "He's beating her. Let's stop it." He said, "Okay." And then he, after having been told by that man to leave his home, re-entered the home in a concert of action with several others. The record is quite confusing as to who was there, but I know from the evidence the defendant was there, acting in an unlawful manner. So whether he fired the shot or Sutton fired the shot is immaterial. The act of one was the act of all. By his testimony, he struck the man in his own home. There is a finding of guilty of murder in manner and form as charged in the indictment.

Before entering the judgment the court noted:

> This is just the type of situation the law contemplates when they say that the act of one is the act of all.

335

The defendant urges that he cannot be held accountable for the murder. Section 5-1, chapter 38, of Ill Rev Stats 1967, provides:

> A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in Section 5-2, or both.

Section 5-2 provides:

> A person is legally accountable for the conduct of another when: (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.

It has been held that where parties engage in a common venture to beat another person who is killed as a result of the beating, any one of the participants may be held guilty even though he did not take part in the killing and did not assent to any arrangement which had death as its object. Brennan v. The People, 15 Ill 511, 516.

In People v. Rudecki, 309 Ill 125, 140 NE 832, it was held that if there is a common design to do an unlawful act, whatever occurs in the furtherance of the common design is the act of all, and the court said at page 129: "A shot fired by one member of the mob was a shot fired by all of them, and all of them must answer for the result."

In People v. Richardson, 32 Ill2d 472, at 476, 207 NE2d 478 the court said:

> "It is the defendant's primary contention that the evidence failed to show a common design or purpose to commit a felonious act and that he should not, therefore, be held accountable for the actions of

other members of the group. We have held, however, that proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commisson of an act by a group. (See People v. Rybka, 16 Ill2d 394; People v. Clark, 30 Ill2d 67.) Furthermore, the fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group."

In People v. Rybka, 16 Ill2d 394, 158 NE2d 17, a high school student (Palmer) died after being struck on the head with a hammer by Joseph Schwartz. Ronald Rybka was present in the group when the crime was committed, but there was no evidence that he or any of the others struck at Palmer or threatened him in any way. The court said at page 405:

"One may aid and abet without actively participating in the overt act. (People v. Marx, 291 Ill 40; People v. Taylor, 319 Ill 174; People v. Brendeland, 10 Ill2d 469.) Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction as a principal for a crime committed by another in furtherance of the venture. People v. Tarver, 381 Ill 411; People v. Rudecki, 390 Ill 125."

Also see People v. Raybourn, 72 Ill App2d 379, 219 NE2d 711.

In the case before us the group of boys went into the apartment with the avowed purpose of stopping Tate's chastisement of his daughter in his own home. There was testimony that one of the group had a gun, which fact was known to all of the boys. Someone asked for and obtained possession of the gun; one witness said

337

it was the defendant. Soon after they had gone back into the apartment the group attacked Tate and he was subsequently shot by one of them. Under the decisions, the fact that the defendant associated himself with the group (which he knew was armed with a deadly weapon) is sufficient to tie the defendant in as a principal in the murder. He admits that he went into the apartment with the others after they had been informed that Tate was beating his stepdaughter. He also admits that he struck the deceased.

The judgment of the Circuit Court is affirmed.

Affirmed.

LYONS, P. J. and BURKE, J., concur.