THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BOB N. JOVICEVIC *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 77-127

Opinion filed July 26, 1978.—Rehearing denied September 6, 1978.

Jerome Rotenberg, of Chicago, for appellants Rajko Jovicevic and Bob N. Jovicevic.

Alan J. Wolf, of Robbins, Coe, Rubinstein & Shafran, Ltd., of Chicago, for appellant Raymond Strama.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Rimas F. Cernius, and James Hullihan, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendants, Bob N. Jovicevic, Rajko Jovicevic and Raymond J. Strama were each charged with attempt (murder), aggravated battery causing permanent disability, aggravated battery causing permanent disfigurement, and aggravated battery causing great bodily harm. The aggravated battery count alleging permanent disfigurement was dismissed on the defendants' motion for a directed verdict at the close of the State's case. Following a jury trial, all three defendants were found guilty of aggravated battery causing great bodily harm and not guilty on the remaining counts. Bob Jovicevic was sentenced to 2 to 6 years in the Illinois Department of Corrections; Rajko Jovicevic and Raymond Strama were each sentenced to 1 to 3 years. The defendants appeal from these judgments and sentences. The Jovicevic brothers, who were represented by the same attorney at trial, raise the following issues on appeal: (1) whether Rajko Jovicevic was prejudiced by being represented by the same attorney as his brother Bob Jovicevic; (2) whether the trial court failed to adequately and fully instruct the jury on the law of accountability; and (3) whether the trial court acted arbitrarily and abused its discretion in denying the defendants' request for probation. Defendant Raymond Strama, in addition to arguing, as do the Jovicevic brothers, that the trial court erred in imposing the sentences and denying probation also questions: (1) whether the trial court erred in holding that section 115—4(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(f)) was unconstitutional and thereby denied the defendant his statutory and substantive right to conduct *voir dire* examination of prospective jurors; and (2) whether the State sustained its burden of proving the defendant guilty of aggravated battery causing great bodily harm beyond a reasonable doubt. The Jovicevics adopt Strama's arguments insofar as they apply to them.

At around 1:30 a.m. on December 1, 1974, four persons, three of whom were identified as these defendants, were observed beating Craig Morrissey outside Papas III, a tavern on North Lincoln Avenue in Chicago. The fourth person was not identified. The State presented five witnesses who had been patrons of Papas III that night and who went outside to observe or to attempt to break up the fight.

Gene Harris, an off-duty Chicago police officer, was in the bar that evening. He testified that he saw the defendants and a fourth man dragging Morrissey toward the front of the bar. He saw the owner of the tavern, Mr. Dispensa, trying to push the defendants and the other man away from Morrissey. Harris did not see Morrissey throw a punch. The four then continued to drag Morrissey out of the tavern. At that point a waitress came up to Harris and said there was a fight going on outside and that he had better break it up. Officer Harris then went to the front window of the tavern where he could see the three defendants and the fourth individual beating Morrissey outside on the curb by a parking meter. He testified that all three defendants were punching Morrissey as Morrissey stood and attempted to cover himself.

The State's four other occurrence witnesses were also in the bar at this time and testified to seeing the defendants and another man beating Morrissey. William Block, Steven Kern, Lawrence Moore and Andrew Groveman were in the front area of the bar. Andrew Groveman testified that as he stood at the bar he noticed someone being escorted out the door. He then noticed a commotion outside through the front window of the bar. He saw the three defendants and a fourth individual beating Morrissey by punching and kicking. He stated that Morrissey was outside in front of the bar between two parked cars leaning on the trunk of the car.

William Block also saw the defendants and the fourth man beating Morrissey. He stated that they were throwing punches at him "like a punching bag." He did not see them kick Morrissey and did not see Morrissey strike them back.

Lawrence Moore testified that one of the four held Morrissey while the others struck him with their fists in the midsection. Moore identified the defendants Strama and Bob Jovicevic as two of the assailants.

Steven Kern testified that he saw the fight through the front window and saw four men striking Morrissey. They punched him from his head to his waist and when he slumped over they kicked him. He stated that the victim did not throw any punches. Kern identified the defendants as three of the assailants.

Block, Moore, Kern and Groveman all went outside to intercede. They testified that it was snowing and slippery out. Block and Kern tried to pull the defendants away from Morrissey, but were pushed aside. They then went back into Papas III and asked someone to call the police. When they came back outside, Harris was there. Harris testified that when he came out of the bar Morrissey was on the ground and that the defendants were kicking him. Harris identified himself as a police officer and told the defendants to break it up. Two or three of the assailants led by Strama then started to go after Harris. Harris again identified himself as a police

officer and pulled his gun out and held it in the air. Block testified that Strama and Rajko Jovicevic and another man were moving toward Harris with clenched fists. Harris testified that Strama said, "Shoot me" and continued toward him. Harris stated that he hit Strama across his face with the barrel of the gun as Strama was trying to grab him. At that point Block and Kern approached Strama and attempted to pull him away from Harris. Strama then punched Block in the jaw and Kern wrestled Strama to the ground.

While this secondary altercation ensued, Morrissey was standing where he had been attacked. Moore described him as being semiconscious. Block testified that Morrissey was "out of it" and "punch drunk." Harris stated that Morrissey was dazed and holding himself up by leaning against a parking meter. At this point, Bob Jovicevic walked up to Morrissey and "cold cocked" him. Block testified that Bob Jovicevic struck Morrissey in the face causing him to fall flat on his back to the street. Morrissey was unconscious after receiving this blow to the head. Moore testified that Bob Jovicevic used his whole body in hitting Morrissey in the face. Uniformed police then arrived and Morrissey was taken to Illinois Masonic Hospital. None of the State's witnesses knew or had seen Craig Morrissey before the night of this occurrence.

Dr. Jose Salazar, a neurosurgeon, treated Morrissey at Illinois Masonic Hospital. Dr. Salazar testified that he first observed and examined Morrissey on December 2, 1974, in the intensive care unit. Dr. Salazar was informed by Dr. Smith, a resident neurosurgeon who had initially examined Morrissey in the emergency room, that Morrissey had suffered a grand mal seizure in the emergency room. Dr. Smith had initially diagnosed a head injury with a possible fracture at the base of the skull and mentioned that Morrissey had the smell of alcohol on his breath. Drs. Smith and Salazar discussed the possibility that Morrissey had alcoholic withdrawal seizures, but ruled this out because such seizures only occur after an alcoholic has been deprived of alcohol for several days. Dr. Salazar diagnosed the seizure as grand mal seizure resulting from a dysfunction of the brain following trauma. On cross-examination, Dr. Salazar admitted that in the case of a person with epilepsy, a seizure could be precipitated by the use of alcohol but that he had no knowledge that Morrissey had been an epileptic. Morrissey denied any prior history of epilepsy. When Dr. Salazar examined Morrissey he noted that Morrissey complained that his head hurt. Dr. Salazar described him as confused, lethargic, restless, thrashing around and very uncooperative. He had a discoloration behind his left ear and also had black and blue marks around the eyes and lids. There was a weakness of the left side of Morrissey's face and blood behind the left eardrum. This indicated head injury or dysfunction of the nervous system. Dr. Salazar diagnosed a

fracture on the left side of the base of the skull. On December 6, 1974, an angiogram was performed which showed a swelling on the left side of the brain. The doctor also noted that Morrissey had difficulty speaking because of the injury to the left side of the brain which controls speech. He was given medication to reduce the pressure on his brain and to prevent seizures. Morrissey was discharged on December 21, 1974, to his father's care. Dr. Salazar testified that tests had shown changes in Morrissey's brain and that these changes indicated the possibility of future seizures. Dr. Salazar could not say whether these changes were temporary or permanent.

All three defendants testified on their own behalf. The Jovicevics' sister, Mary Feher, and Bob's wife, Victoria, were also present on the night in question and testified for the defense. At approximately 10 p.m. on November 30, 1974, Bob and Victoria Jovicevic and Andrew and Mary Feher arrived at Papas III. They joined Rajko Jovicevic, Ray Strama, Mike and Judy Marroquin and Patrick Witke and sat at a table near the bar. The men had four or five pitchers of beer between 9 p.m. and 1 a.m. and the women drank Coca-cola. The witnesses had noticed Morrissey sitting with a group of five or six people at a nearby booth.

Victoria Jovicevic testified that at about 12:45 a.m. she was playing a game on the bowling machine with Andrew and Mary Feher when Morrissey came up to her and said "Hey, baby, what's that on your chest?" She ignored him and he continued past her to the men's restroom. He returned a few minutes later and repeated something to the same effect and she again said nothing.

When they finished the bowling game, they returned to their table. Victoria's husband, the defendant Bob Jovicevic, told her he was going to the washroom and left. Victoria testified that she was standing next to her chair and was telling her brother-in-law Rajko that she wanted another Coca-cola, when Morrissey came up behind her, forcibly put his hand down the back of her pants and grabbed her. At this point, her husband was still in the washroom. When Rajko told Morrissey to get his hands off Victoria, Morrissey laughed and grabbed harder. Morrissey then swore at Rajko and struck him on the shoulder. Rajko testified that he then grabbed Morrissey and pushed him back. Mary Feher was at the table and testified that after Morrissey hit Rajko, Rajko hit him back. Victoria stated that they shoved each other. Both Rajko and Victoria testified that at this point the defendant Raymond Strama grabbed Rajko. However, Strama denied that he ever touched Rajko or Morrissey. A crowd formed and everyone was pushed toward the front door. The group continued out onto the sidewalk in front of Papas III. Morrissey and Rajko fell down to the ground and were rolling around, grabbing each other and trying to strike one another. Strama grabbed Rajko in an effort to pull him off

Morrissey. Strama testified that as he was grabbing Rajko, Harris grabbed him from behind and told him to break it up. Strama said to Harris that he was trying to break it up, but when Harris pulled a revolver and Strama proceeded toward him, Harris hit him in the mouth with the pistol and broke two front teeth. Strama was then grabbed from behind by William Block and Strama hit Block. Kern then jumped on Strama's back and knocked him down. The defendants testified that Harris did not show a badge during the incident and did not identify himself as a police officer.

By this time, the defendant Bob Jovicevic had returned from the bathroom. He testified that he saw two men grabbing one another near the table where he had been sitting. As he approached the group he saw Raymond Strama following them and noticed that the bartender was pushing the group out towards the door. He followed the group out and as he arrived at the doorway he spoke to his wife. He asked her what was happening and she told him about the incident with Morrissey. He saw a man grab Strama and then hit him in the face with a revolver. He then walked over to Morrissey who was standing on the curb between two parked cars and asked him why he had grabbed his wife. He testified that Morrissey told him to "Get fucked." He stated that Morrissey then raised his right hand and hit him in the chest with his fist. Jovicevic further testified that Morrissey appeared "high" and that his eyes were watery, bloodshot and dilated and his speech was slurred. Bob Jovicevic then hit him in the face with his hand. Jovicevic stated that it was slippery outside and it appeared that Morrissey slipped and fell to the ground. Victoria and Mary Feher also saw the blow and said that Morrissey slipped and fell after Bob punched him in the face. Bob Jovicevic was attempting to pull Kern off Strama when the police arrived and took Morrissey to the hospital.

Morrissey testified that he could not recall what happened to him at Papas III that night and did not remember leaving there. He stated that he could not identify the defendants and that he had no history of epilepsy, amnesia or drug addiction.

At trial, Bob and Rajko Jovicevic were both represented by retained counsel; Raymond Strama was represented by the Public Defender's office. In discussing the issues raised on appeal, we will treat them in terms of all three defendants, unless specifically stated otherwise.

The defendants initially contend that the trial court erred in holding that section 115—4(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(f)) was unconstitutional and in conflict with Supreme Court Rule 234 (Ill. Rev. Stat. 1975, ch. 110A, par. 234) and thereby denied them their right to conduct *voir dire* examination of the prospective jurors.

Section 115—4(f) now reads:

"After examination by the court the jurors shall be examined, passed upon, accepted and tendered as a panel of 4 commencing with the State. Each opposing counsel has the right to conduct his own voir dire examination of each prospective juror for the purpose of determining such juror's qualifications, bias and prejudice, or freedom therefrom." Ill. Rev. Stat. 1975, ch. 38, par. 115—4(f).

Rule 234 also deals with *voir dire.* It provides:

"The court shall conduct the voir dire examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions." Ill. Rev. Stat. 1975, ch. 110A, par. 235.

■■ Rule 234 is made applicable to criminal trials by Supreme Court Rule 431. (Ill. Rev. Stat. 1975, ch. 110A, par. 431.) The Illinois Supreme Court recently considered this same issue in *People v. Jackson* (1977), 69 Ill. 2d 252, 371 N.E.2d 602. There the court concluded that the statute upon which the defendants now rely was "a legislative infringement upon the powers of the judiciary. Accordingly, it is void." (*Jackson,* at 260.) This case is controlling on this issue and we find that the trial court ruled properly on the matter.

The defendants Strama and Rajko Jovicevic also argue that the State failed to meet its burden of proving the defendants guilty beyond a reasonable doubt of aggravated battery causing great bodily harm. In conjunction with this argument, the defendants contend that the trial court failed to adequately and fully instruct the jury on the law of accountability, and defendant Rajko Jovicevic argues that he was prejudiced by being represented by the same attorney as his brother, Bob Jovicevic. The basic premise of this argument is that the gravamen of the offense charged against the defendants was the blow to the head sustained by Morrissey when he was struck by Bob Jovicevic, and that defendants Strama and Rajko Jovicevic were not legally accountable for that act.

The defendants state that the evidence adduced at trial failed to prove the extent and cause of Morrissey's injuries. However, we believe that the evidence adduced at trial was sufficient to prove that Morrissey suffered a skull fracture as a result of the beating at Papas III on the morning of December 1, 1974.

The defendants further argue that there was no evidence adduced by the State of any planned or intended act or offense against Morrissey for which they could be held accountable for acts allegedly committed in furtherance thereof. Section 5—2 of the Criminal Code of 1961 provides in pertinent part:

"A person is legally accountable for the conduct of another when:

\* \* \*

(b) The statute defining the offense makes him so accountable; or

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1975, ch. 38, par. 5—2.

The general rule is that where two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts. (*People v. Hubbard* (1973), 55 Ill. 2d 142, 147-48, 302 N.E.2d 609; *People v. Armstrong* (1968), 41 Ill. 2d 390, 398-99, 243 N.E.2d 825.) The Illinois Supreme Court in *People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29, held that the word "conduct" used in the statute defining when accountability exists encompasses any criminal acts done in furtherance of the planned and intended act, not only those that were specifically intended. (*Kessler*, at 497.) In determining a defendant's accountability for a crime, the trier of fact may consider the defendant's presence at the scene of the crime. (*People v. Davis* (1976), 43 Ill. App. 3d 603, 614, 357 N.E.2d 96; *People v. Hill* (1968), 39 Ill. 2d 125, 135, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305.) While this presence at the scene of the crime and consent to its commission do not alone constitute aiding or abetting (*In re Dugan* (1972), 9 Ill. App. 3d 58, 291 N.E.2d 303), proof of acts in furtherance of a common design or purpose to commit a crime need not be supported by words of agreement, but may be drawn from circumstances surrounding the commission of the acts by the group. (*In re Johnson* (1976), 40 Ill. App. 3d 493, 496, 352 N.E.2d 257; *People v. Richardson* (1971), 132 Ill. App. 2d 712, 270 N.E.2d 568.) Furthermore, the fact that the criminal acts were not committed pursuant to a preconceived plan is no defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. *People v. Richardson* (1965), 32 Ill. 2d 472, 476, 207 N.E.2d 478; *People v. Bracey* (1969), 110 Ill. App. 2d 329, 337, 249 N.E.2d 224.

■■  In the case at bar, all three defendants were positively identified by witnesses as being participants in the beating of Morrissey. Although Morrissey apparently was alone and did not strike back, he was repeatedly punched by all three defendants like "a punching bag." One witness stated that Morrissey was beaten to the ground and kicked by all three defendants. When the secondary altercation between Block, Kern, Strama, and Harris ensued, Morrissey was left "dazed," "out of it" and "punch drunk." There followed the final blow to Morrissey by Bob Jovicevic. Because the defendants were part of a group engaging in criminal conduct, the beating of Craig Morrissey, we find it was proved beyond a reasonable doubt that defendants Strama and Rajka Jovicevic were accountable for the injuries inflicted by the group even though they may not have inflicted the final devastating blow. *People v. Richardson* (1978), 61 Ill. App. 3d 718, 377 N.E.2d 1235.

The defendants also contend that the trial court failed to adequately and fully instruct the jury on the law of accountability. Pursuant to the request of the State and over the objection of defendants, the court gave the following Illinois Pattern Jury Instruction relating to accountability to the jury:

> "A person is responsible for the conduct of another person when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of the crime." Illinois Pattern Jury Instructions, Criminal, No. 5.03.

The defendants now argue that once the court undertook to instruct the jury relating to accountability, it was under a duty to fully instruct the jury as to all of the elements of the crime and possible defenses. Therefore, the court should have given on its own motion an instruction on withdrawal from a criminal combination such as the following:

> "However, a person is not so accountable, unless the statute defining the offense provides otherwise, if: * * *
> (3) Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense."

■■■  The defendants never tendered such an instruction to the court. They justified this failure by stating it was their contention that the provisions of the accountability statute did not apply to the factual situation in the case at bar. However, the general rule is that a party who

desires a specific instruction must offer it and request the court to give it and the trial court has no obligation to instruct on its own motion. (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487.) While it has been held that a court bears the burden of seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof (*Parks*, at 137; *People v. French* (1972), 5 Ill. App. 3d 908, 284 N.E.2d 481), it is settled in our law that it is the defendant's responsibility to tender to the court jury instructions which bear on his theory of the case. (*People v. Colon* (1973), 9 Ill. App. 3d 989, 998, 293 N.E.2d 468.) In the case at bar, viewing the trial as a whole, it is clear that the jury was not deprived of essential guidance in its evaluation of the evidence by the failure to give the instruction on withdrawal. The evidence fails to show any factual basis for maintenance of this defense other than that the defendants, Rajko Jovicevic and Raymond Strama, were not in the immediate vicinity when Bob Jovicevic struck the final blow. In order to maintain such a defense, a defendant must show that before the commission of the offense, he terminates his efforts to promote or facilitate such commission and does one of three specific acts. Here, not only did the evidence show that Morrissey was rendered dazed from the prior beating in which both Rajko Jovicevic and Strama had participated, but there was no evidence that either wholly deprived his prior efforts of effectiveness, gave timely warning to the proper law enforcement authorities, or made an effort to prevent the commission of the offense. We conclude that under the facts of this case, it was not error for the trial court to fail to instruct the jury *sua sponte* concerning the defendants' theory of the case. Such instruction was never tendered by the defendants nor was it demanded by the evidence adduced at trial.

■■ Rajko Jovicevic next argues that there was a conflict created by the joint representation of the Jovicevics and that he was prejudiced thereby. However, as noted previously, Bob and Rajko Jovicevic were represented by privately retained counsel. The right to separate counsel is not automatic. Representation by a single attorney is allowable provided it is not evident that a conflict of interest between the defendants can be anticipated. (*People v. Bullock* (1977), 51 Ill. App. 3d 149, 155, 366 N.E.2d 475; *People v. Husar* (1974), 22 Ill. App. 3d 758, 762, 318 N.E.2d 24.) Where there is no showing that a single attorney's representation of multiple defendants caused prejudice to an individual defendant, or that a different result might have been obtained had separate counsel been appointed or retained, a court of review will not disturb a judgment on the basis of conjectural or speculative conflicts of interest of co-defendants. (*Bullock*, at 155; *People v. Craig* (1977), 47 Ill. App. 3d 242, 247, 361 N.E.2d 736.) Co-defendants are entitled to separate counsel if their positions are antagonistic, but such antagonism is not necessarily

present in every instance where the same attorney represents two or more co-defendants. *Craig,* at 247.

■■ Our review of the record leads us to conclude that there is no real conflict of interest. Rajko Jovicevic was able to present his defense that he did not strike the final blow and was engaged elsewhere at that time. Bob Jovicevic admitted in court that he struck the final blow and supported Rajko's testimony that Rajko was engaged in an encounter elsewhere at the time he hit Morrissey. Rajko argues that his counsel could not imply either in cross-examination or in his closing argument that he was not associated with the final blow to Morrissey because this would cause him to admit the guilt of Bob Jovicevic. However, in view of the fact that Bob Jovicevic had admitted striking that blow we fail to see how any such reference to the fact that both Rajko Jovicevic and Strama were engaged elsewhere, in light of their testimony on that point, would prejudice any defendant. Any emphasis that was given to Bob Jovicevic's conduct was necessitated by his greater culpability. Such a situation does not necessarily constitute a conflict of interest. In *United States v. Mandell* (7th Cir. 1975), 525 F.2d 671, two of the defendants argued that their trial counsel, who jointly represented three co-defendants, ignored their defense in favor of that of the third defendant. There, the court found that any added emphasis given to the defendant's role in the scheme necessarily benefitted the other defendants. The court concluded:

> "If we were to find a Sixth Amendment violation on the basis of these defendants' argument, we would, in effect, have to find such a violation in any case where two defendants of unequal culpability are represented by the same counsel. The Sixth Amendment guarantee of Assistance of Counsel commands no such rule." (*Mandell,* at 678.)

In the absence of any proof of a conflict of interest, we find there has been no prejudice to either defendant from the lack of separate counsel.

■■ Finally, the defendants argue that the trial court acted arbitrarily and abused its discretion in denying their request for probation and instead sentencing them to a term of incarceration in the State penitentiary. The defendants argue that the attack on Morrissey was not premeditated and was in fact a spontaneous action precipitated by alcohol and the uncontroverted verbal and physical assault upon Bob Jovicevic's wife, Victoria. They point to the fact that they had no prior criminal records, were employed, and leading exemplary lives. They argue that the imposition of penitentiary sentences upon them will greatly reduce their ability to live useful lives and separation from their community will cause irreparable hardships which could be avoided by a sentence other than the extreme punishment of imprisonment. However, such a sentence was imposed only after a full aggravation and mitigation

hearing. The judge was informed that each of the defendants was a first-time offender and had other mitigating factors in his background. The court expressly stated that it had studied the presentence investigations which were made on each of the defendants. At the sentencing hearing, the court stated:

"In arriving at what I believe to be an appropriate sentence in this case, the court has considered the constitutional mandate that all penalty [*sic*] be determined both according to the seriousness of the offense and with the object of restoring the defendants to useful citizenship. Towards that end this court has considered the defendants' ages, their education, their family ties, their employment, and the fact that none of them had prior criminal records.

\* \* \*

In addition to all that material, I have had the opportunity to observe and consider each of these defendants' attitudes and their demeanor during trial and during the hearing here today, and I have, as directed by the Constitution and by the statutes, considered the nature and circumstances of the offense as it was presented during the trial.

\* \* \*

From all of these findings and all of these considerations, I find that imprisonment is necessary and appropriate in this case, and that probation, having been considered, would be inappropriate due to the seriousness of the attack and the nature and consequences of their conduct."

The Illinois Supreme Court in *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, reaffirmed the long standing rule that "absent an abuse of discretion by the trial court a sentence may not be altered upon review." The record in the case at bar clearly reveals that the sentencing judge reached his decision only after a great deal of thought and deliberation. The trial court, after consideration of the proper factors and full compliance with statutory requirements, reached a reasoned decision that prison sentences would best serve the interests of justice. The trial judge was in a superior position to observe and evaluate the myriad factors which comprised the sentencing determination. It is not our function to serve as a sentencing court, and we will not substitute our judgment for that of the trial court merely because we may have imposed a different sentence had that function been delegated to us. We cannot say that the trial court abused its discretion in imposing sentence in the instant case.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and SIMON, JJ., concur.