THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES COLEMAN, Defendant-Appellant.

First District (6th Division)   No. 1—90—0971

Opinion filed June 4, 1993.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Ann L. Benedek, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Charles Coleman, was indicted with his brother, Maurice Coleman, and Willie Powell for the first degree murder and armed robbery of Willie Melson. The defendant waived a jury and was tried alone. Maurice Coleman testified for the State. The defendant was found guilty of first degree murder and armed robbery and sentenced to 60 years' imprisonment for murder and 30 years for armed robbery, with the sentences to run concurrently. The defendant contends that procedural or evidentiary errors deprived him of a fair trial; he does not contend that the evidence was insufficient to establish his guilt beyond a reasonable doubt.

In August 1988, the defendant was living with Elizabeth Stampley in her apartment on the second floor of a building at 4810 South Michigan in Chicago. Seventy-year-old Willie Melson lived in the third-floor apartment directly above Stampley's apartment. On August 10, Melson's decomposed body was found in his apartment. Under a sheet that covered the body, police officer Owens found a butcher knife and a fork sticking out of Melson's chest. Owens also found $200 in Melson's pants pocket and a bullet near Melson's body. An autopsy disclosed a cooking fork in Melson's right chest, a carving knife in his left chest, nine stab wounds in his chest, neck and back and a gunshot wound in the back of the head. The decomposed condition of the body was consistent with a July 29, 1988, date of death, but the exact date of death could not be determined. A "deformed small caliber bullet" was recovered from the autopsy cart at the time of the autopsy; the bullet was beneath the head and upper neck of Melson.

Willie Powell was arrested on September 13, 1988, and implicated the defendant and his brother. Powell did not testify at the trial, but his statement to the police is involved in one of the errors assigned by the defendant and will be discussed in detail later.

The defendant was also arrested on September 13, 1988, but no statement was taken from him. On December 2, 1988, Maurice Coleman was arrested. He also gave a statement to the police that will be discussed later.

Brian Melson, the son of the deceased and a Chicago police officer, last saw his father in early June 1988. At that time he visited his father at his apartment, where he had lived alone for the past 10 years. During that period, Brian had visited his father at the apartment on 10 to 12 occasions; most of the time his father came over to Brian's house.

Brian testified that his father had been employed by Walgreens for 18 years and was paid by check. His father had cashed his checks

"for years" at a currency exchange on 47th Street and kept his cash either in his wallet or in a shoe at home. His father had recently received vacation checks totalling over $2,000. On his last visit to the apartment, Brian saw Budweiser beer, which his father bought by the case, and Scotch whiskey. His father kept a black .25 automatic handgun with a woodgrain finish handle at home; he sometimes carried it with him.

Maurice Coleman was living with his sister at 4803 South Wabash on July 29, 1988. He testified that at one o'clock that afternoon, the defendant, his brother, came through the back door of Maurice's home. The defendant's "left baby finger" was bleeding; he was carrying a 12-pack of Budweiser, had a bottle of Scotch in his hand and $60. The defendant also had a .25 automatic handgun with a brown handle. The defendant told Maurice that he had stuck someone up on 51st and Wentworth. After he and the defendant talked about going to the hospital, Maurice called an ambulance, but the defendant decided to go to the hospital with Maurice in his car. Maurice and the defendant first went to visit a friend named Rodney and purchased some heroin. After "snorting" the heroin, the defendant and Maurice were dropped off by Rodney at 59th and Ashland. The defendant asked Maurice what Maurice would say if the defendant told him that he killed someone. Maurice did not respond but just shrugged his shoulders.

They both went to Bernard Mitchell Hospital, but after waiting two hours they left without the defendant receiving any stitches. On the way back to their sister's house, the defendant told Maurice that if there were not any police around they would go up to the "apartment." In the apartment, which was Melson's, Maurice saw the deceased on the floor with cooking utensils sticking out of his chest. The defendant went into the deceased's pockets and removed about $500. Maurice also reached into the deceased's back pocket and took his wallet. They returned to their sister's house, and Maurice gave his sister some rent money.

Maurice and the defendant then left their sister's house to visit Edward Gibson; they purchased some drugs; spent the evening with Gibson; and returned to their sister's house. On the following day, Maurice and the defendant went to 100th Street and sold the gun to a "friend." They made contact with that "friend," to whom they sold the gun, through the friend's brother, whose name Maurice did not recall. He remembered that the brother lived at 64th and Eberhart.

Maurice was arrested on December 2, 1988, and charged with murder and armed robbery. On the same day, he made a statement to to an assistant State's Attorney in which he implicated the defendant.

Edward Gibson testified that the Coleman brothers came to his place of work and the three of them went to 50th and Cottage Grove, where the defendant and Maurice purchased heroin. Gibson noted a bandage on the defendant's right little finger. He saw that the defendant had either $1,100 or $1,300 in cash with him and a small caliber revolver with a brown handle. When Gibson asked the defendant about purchasing the gun, the defendant responded, "You don't want this one. *** That was a throw-away piece." The defendant told Gibson that he got the money from an old man he saw coming out of a currency exchange on 47th Street; he followed the man into an alley and strong-armed him and took his money. When Gibson asked about the cut on the defendant's hand, the defendant said that he got it because the old man had a knife and the defendant had to wrestle it out of the old man's hands.

Ethel Stampley testified that she had been living with the defendant in the second-floor apartment at 4810 South Michigan. The defendant told her that his bleeding finger resulted from cutting cheese with the butcher knife that Stampley had received as a gift. The defendant told her that he threw the knife away after he had cut himself. She identified the knife that had been taken from the deceased's body as her missing butcher knife.

The defendant first contends that the State knowingly used perjured testimony by calling Maurice Coleman as a witness. The defendant filed a pretrial motion to bar the State from calling either Maurice Coleman or Willie Powell as witnesses. The motion alleged that the State had engaged in plea bargaining with Maurice Coleman and Powell and that Powell had accepted an offer of three years' imprisonment in return for his testimony against the defendant. Attached to the motion were the statement given to Assistant State's Attorney Tyrell by Maurice Coleman and the statement given by Powell to Assistant State's Attorney William McGarr.

Maurice Coleman's statement was, in substance, the same as his subsequent testimony but contained the following additional information: On the way to the hospital, the defendant told Maurice that he had killed someone. When the defendant went to "rip off" the old man, he took a knife with him. The old man lived upstairs from the defendant. When the defendant "stuck up" the old man, the old man started struggling and got the knife away. The defendant took a

kitchen fork and a knife and stabbed the old man. The defendant then took the old man's money and liquor and shot him.

Willie Powell was arrested on September 13, 1988, and made a statement in which he said that sometime in early August the defendant asked him to knock on the deceased's door and ask if the deceased wanted Powell to clean his house or to shop for him. Powell was to see if the deceased "had a big wad." Powell did knock on the deceased's door, but he was not home. On the following day he saw the deceased arrive home, and he told the defendant. The defendant picked up a gun from a table and whispered something to his brother, Maurice. The defendant and Maurice went upstairs, and Powell sat at the table and waited. He heard Willie Melson "holler," and later he heard two or three shots. A minute later he heard footsteps running downstairs and out the building. Powell left the building, returned and went up to Melson's apartment. The door was slightly open, and Powell was able to see Melson's body lying in the apartment. Powell left the building and never returned.

At the hearing in support of the defendant's motion *in limine*, Ronald Babb testified that he was an attorney appointed to represent Willie Powell. Babb testified that, on his advice, Powell accepted the State's offer in exchange for testimony consistent with his statement. He was not permitted to testify to the specific terms of the offer, apparently on the supposed ground that any conversation between Babb and the assistant State's Attorney was barred by the attorney-client relationship. No issue is raised of this ruling. On cross-examination, Babb said that the offer was extended to his client "in exchange for his truthful testimony." He also said that he did not know whether Powell's statement was true.

Mary Lambert, Maurice Coleman's attorney, testified that two offers had been made to Maurice in exchange for his testimony. Maurice accepted the second offer, which was for a shorter period of recommended imprisonment. Again the State's objection to the terms of the specific offer was sustained, again apparently on the ground that the conversation between the assistant State's Attorney and the defendant's attorney was protected by the attorney-client relationship between Maurice Coleman and Lambert. Ms. Lambert also testified on direct examination that the offer was made in exchange for Maurice Coleman's testimony "consistent with" his previous statement. On cross-examination she testified that it was her understanding that the offer was in exchange for Maurice Coleman's "truthful testimony." She also testified that she did not know whether Maurice Coleman's statement was true.

The defendant relies upon *Miller v. Pate* (1967), 386 U.S. 1, 17 L. Ed. 2d 690, 87 S. Ct. 785, and *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173. Neither case supports the defendant's argument. In *Miller*, a key piece of evidence was a pair of shorts. The trial judge sustained the State's objection to the defendant's pretrial motion to permit a scientific examination of all physical evidence. A chemist testified for the State that the shorts were stained by blood type A. The deceased had type A blood. At the time the chemist testified, the prosecutor knew that the stains were paint, not blood. In reversing the conviction, the supreme court noted that the "prosecution [had] deliberately misrepresented the truth." *Miller*, 386 U.S. at 6, 17 L. Ed. 2d at 694, 87 S. Ct. at 788.

In *Napue*, cited in *Miller*, on cross-examination, a prosecution accomplice witness testified that he had not been promised anything for his testimony. On redirect examination the prosecutor specifically asked whether he had made any promises to the witness, and the witness said that he had not. It was later conceded that that answer was false and was known to be false by the prosecutor who asked the question.

■ It is safe to say that the evil in *Miller* and *Napue* lay in the deliberate misrepresentation by the prosecutors or, at least, the suppression of the truth by the prosecutors. The procedure followed by the State in this case was unusual, but there was no suppression of the truth and there were no misrepresentations by the prosecutors. We agree with the defendant's contention that both Maurice and Powell could not have been telling the truth, but that fact is not relevant to the issue before us. We also agree with the State that, in the face of conflicting witnesses' statements, the State may frame its own theory in the case, choose to call its witnesses and is not required to present every witness. (*People v. Beacham* (1977), 50 Ill. App. 3d 695, 365 N.E.2d 737.) The State may also advance alternative theories of guilt. (*Cf. People v. Bracey* (1969), 110 Ill. App. 2d 329, 249 N.E.2d 224 (principal State witness identified defendant as the shooter in murder prosecution; appellate court affirmed trial judge's finding of guilt on accountability theory).) The State, therefore, was not required to call Powell, and it could not prevent the defendant from calling him if he was willing to testify for the defendant. We can understand why the defendant would not call Powell, even if he were willing to testify. His story would have contradicted Maurice but would also have been highly damaging to the defendant.

The defendant next contends that an *ex parte* conference between Maurice Coleman and his private attorney during a recess denied the defendant a fair trial.

Maurice testified that, in exchange "for his truthful testimony," the prosecutors would file a charge of concealment of a homicidal death and recommend a sentence of imprisonment of two years. He had been convicted of indecent liberties in 1984.

Maurice then gave the testimony which we have previously recited. The prosecutor attempted to question Maurice about conversations he had had with the defendant about the robbery and the murder. A defense objection that a question was leading was sustained. Maurice was then asked a number of times if he had had conversations with the defendant, and he said that he had not. The prosecutor was then permitted to bring out from Maurice the contents of the statement he had made to Assistant State's Attorney Tyrell, in which he said that the defendant had told him that he had shot the deceased and stabbed him with a knife he had taken from his apartment. The prosecutor showed the defendant the four-page statement that he had given to Tyrell. The defendant's attorney objected, not on the basis of hearsay, but rather that the questions were leading or that the answers were not impeaching. The only reasonable inference that may be drawn from what then transpired is that Maurice's denial that the defendant told him that he had shot and stabbed the deceased had taken the prosecutor and the defendant's attorney by surprise. We judge that the State was trying either to refresh Maurice's recollection, or "to awaken his conscience." See *People v. Michaels* (1929), 335 Ill. 590, 592, 167 N.E. 857, 858; 134 Ill. 2d R. 238.

When the judge said that he would have a short recess, Mr. Gevirtz, who then represented Maurice Coleman, asked if he would "have a moment to confer with [his] client." When the defendant's attorney objected, the court said:

> "Mr. Gevirtz is not here as a representative of the State. He is here as an attorney representing the witness in this matter. And I believe he is well within his right to ask to confer with him."

After a recess, the following occurred:

> "MR. GEVIRTZ: I have talked to Mr. Coleman a number of times, and there are portions of this testimony that are not clear as to whether or not Mr. Coleman understood, based on conversations he had had with me and with Miss Shines [the assistant State's Attorney] earlier today. If the Court would permit me to just ask him that question, if he understood specifi-

cally the difference between the wording of certain of the questions here now—

STATE'S ATTORNEY: Judge, I would object to that. Counsel is here as a lawyer for the witness. He is neither a proponent or opponent of anyone on trial here. I don't think that he has any standing at all to put questions to the witness.

THE JUDGE: I agree.

DEFENDANT'S ATTORNEY: Judge, just so the record is clear, I want it to reflect that on behalf of Charles Coleman, the defendant in this case, Mr. Sarley [another defense attorney] objected to Your Honor's ruling allowing Mr. Gevirtz to confer with him in the first place. I would point out, as an officer of the court, that the conference did occur; it occurred over our objection in the jury room of this courtroom. In addition to that, that the State's Attorneys, one of the State's Attorneys involved in the prosecution of this case, was also called into the jury room and conferred with Mr. Gevirtz and with the witness, which I found highly objectionable."

Ms. Gordon, an assistant State's Attorney, denied that she was in the room with Gevirtz and the witness in which there were "conversations going on." She said that Mr. Gevirtz called her to the room and asked her a question and she "answered his question" and then left. The defendant's attorney accepted Mr. Gevirtz' assertion that Ms. Gordon's statement was correct. The record, therefore, shows that no prosecutor had a conversation with Maurice Coleman during the conference.

Maurice Coleman was then examined further by the judge as well as the assistant State's Attorney. His testimony, which is confusing, may be interpreted at one point as a denial that he told Assistant State's Attorney Tyrell that the defendant admitted to him that he had shot and stabbed the deceased; at another point that Maurice was confused when Tyrell questioned him; or that Maurice was confused when he answered questions on direct examination in which he said that the defendant had made those statements to him. Later, on cross-examination, Maurice expressly denied telling the assistant State's Attorney that his brother had told him that he shot and stabbed the deceased. One thing is clear from the last part of Maurice's testimony and that is that he was denying that the defendant told him that he had stabbed the deceased with a knife and a fork and that he had shot the deceased.

■ The State does not attempt to justify the judge's ruling permitting Maurice's attorney the "right" to confer with him during his

examination. We have found no case supporting a rule that an attorney has an absolute "right" to confer with his client while the client is testifying. The facts of this case are not to be confused with those cases involving the right of a *defendant* to confer with his attorney before examination has been completed. (See, *e.g., People v. Noble* (1969), 42 Ill. 2d 425, 248 N.E.2d 96.) In *People v. Pendleton* (1979), 75 Ill. App. 3d 580, 248 N.E.2d 96, the appellate court reversed a conviction on double jeopardy grounds where a mistrial had previously been declared because the prosecutors, during a recess, improperly conferred with a complaining witness about the witness' unfinished testimony. The appellate court observed:

"As a general rule, an attorney may also consult with a witness, regarding his testimony, even after the witness is placed on the stand, *provided* a legitimate need arises for such a discussion. [Citation.] The attorney, for example, may require additional information made relevant by the days' testimony, or he may find it necessary to inquire along lines not fully explored earlier. However, since such discussions (after a witness has taken the stand and is still subject to examination) pose a tantalizing potential for misconduct, they are to be strictly scrutinized." (Emphasis in original.) (*Pendleton*, 75 Ill. App. 3d at 594-95.)

Thus, even the assistant State's Attorney in the case before us would not have had an absolute right to confer with Maurice Coleman during his examination.

While we appreciate Mr. Gevirtz' concern that his client's testimony may have jeopardized the plea agreement, we wish to make our position clear that we withhold a blanket approval of an attorney's "right" to confer with his client during the client's examination. There may be circumstances where permitting an attorney to intercede during the examination of his client and to confer with his client would be reversible error.

In any event, we also find that the record does not support a conclusion that the prosecutor "coached" Maurice Coleman during the recess. However, the record would have been better served if the prosecutor voluntarily, or at the request of the defendant's attorney, or at the direction of the judge, had informed the judge of what question was asked of her by Mr. Gevirtz and what her answer was. The principal reason we find no reversible error in the procedure followed is the fact that the record shows that no prejudice inured to the defendant because of what transpired between Mr. Gevirtz, the prosecutor and Maurice Coleman. Indeed, Maurice Coleman's testimony after the

conference was damaging to his credibility and was a denial of evidence that would have been harmful to the defendant.

The defendant's last claim of error centers on the testimony of Brian Melson that his father cashed his checks at a particular currency exchange; had cashed his checks there "for years"; and received vacation checks that exceeded $2,000. We find no reversible error in Brian Melson's testimony. The defendant made a general objection to the question of where the deceased cashed his checks. The judge overruled the objection and said, "He can answer, if he knows." The following occurred:

"Q. And how long had he been cashing his checks at that currency exchange, if you can tell us?

A. For years.

DEFENSE ATTORNEY: Objection.

THE JUDGE: Overruled.

\* \* \*

Q. Where did your father, sir, keep the money from the checks that he cashed at the currency exchange?

DEFENDANT'S ATTORNEY: Objection.

THE JUDGE: Overruled.

WITNESS: He kept it in his house.

\* \* \*

Q. And did your father have any type of weapons in his apartment, if you know?

A. Yes. He had several knives and he had—

DEFENDANT'S ATTORNEY: Objection, Your Honor; *foundation*.

THE JUDGE: Sustained.

Q. Had you ever seen any knives in your father's apartment?

A. Yes.

Q. Can you describe those knives that you saw for us, please.

A. He had several pocket knives." (Emphasis added.)

The witness then described the automatic handgun that his father kept in his apartment.

■ We judge that the defendant's general objection to the testimony of which he now complains was insufficient. He did not object to the initial questions on the ground of a lack of foundation. His later objection on the ground of lack of foundation alerted the State, and the State did provide the proper foundation. Moreover, Melson's answers made after the cautionary remarks of the judge, "if he knows,"

and of the prosecutor, "if you can tell us," lead to the reasonable inference that the witness was testifying to matters which were within his personal knowledge and were not based on hearsay.

■ The defendant also assigns as error other testimony of the witness that his father kept the cash from his checks on his person or in a shoe at his apartment; that he drank Budweiser beer and Scotch; and took vacations in August. No objection was made to that testimony. Consequently, any claim of error now is waived. (*People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.) Again, we believe that the record shows that that testimony also was based on the personal knowledge of the witness. Finally, we disagree with the defendant's claim that the evidence was not relevant.

Because we find that the defendant has failed to establish any prejudicial error, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.