(No. 20377.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN POKOSA, Plaintiff in Error.

*Opinion filed December 18, 1930—Rehearing denied Feb. 6, 1931.*

HALL & DUSHER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, WILLIAM D. KNIGHT, State's Attorney, and JOEL C. FITCH, (ALFRED B. LOUISON, and KARL C. WILLIAMS, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

John Pokosa, fifty years of age, was indicted in the circuit court of Winnebago county for the murder of Gordon Saaf on May 4, 1930. A jury found him guilty of the charge and fixed his punishment at life imprisonment in the penitentiary. Motions for new trial and in arrest of judgment were overruled and judgment was rendered on the verdict. By this writ of error defendant seeks a review of the record.

On May 4, 1930, at about 3:30 o'clock in the afternoon, Gordon Saaf was found dead by police officers in the home of defendant in the city of Rockford. The body was lying in a pool of blood just inside of the front door of the house. Saaf had been shot in the head, directly back of the left ear. Another bullet wound was two inches below the shoulder line on his right side. Powder burns were visible around the wound in his head. Saaf was the son-in-law of Pokosa, having married Estelle Pokosa on April 29, 1930, which was the Tuesday immediately preceding the tragedy. Early in March, 1930, Pokosa had been divorced by his wife, and from then until April 28, 1930, the day before her marriage, his daughter Estelle had kept house for him. She was of legal age and several months before had promised to marry Saaf regardless of her father's objections because of religious differences. They were secretly married at Oregon, Illinois, going from there to Chicago, where they remained for five days. From Chicago the daughter had written to her father, saying in part: "We didn't mean to deceive you and I'll explain all if you'll

only forgive me. * * * Please, dad, don't think too ill of me." Saaf and his wife returned to Rockford on May 4, 1930. Shortly after two o'clock in the afternoon, while on their way to the radio shop owned by Saaf, they met Pokosa. He approached their automobile, a one-seated car, and at their invitation got in with them. The three then drove to the radio shop, where they stopped and had a talk without leaving the car. Then, at Pokosa's request, all three drove to his home. While in the car Pokosa occupied the right end of the seat, his daughter the middle and Saaf was driving. When they stopped at his house Pokosa opened the door of the car, using his left hand, a fact his daughter noticed and testified she then considered rather odd. The daughter entered the house first and was followed by Saaf and Pokosa. What then took place is disclosed in the record solely by the testimony of Estelle, who was within the house, and also to some extent by the testimony of Dan DeVelin, a visitor at the house next door to Pokosa's.

From the testimony of Estelle Saaf it appears that while Saaf was examining the radio, which was out of order, Pokosa handed her a letter which had come during her absence. She then went into the bed-room, leaving the door open, and her father walked in and said to her, "Are you going to stay here as I ask you to?" to which she made no reply, noticing at the time an expression on his face and a look in his eyes which frightened her. She also noticed that his right hand was in his pocket, and she reached over to feel of it, taking hold of him in so doing. She called twice to her husband before her father got away from her. She then went back into the bed-room, and before closing the door she thought she heard her father say something but did not hear what he said. Upon closing the door she started for the window, then returned to the door and locked it, then went to the window and jumped out after hearing two shots. In the interval between her

father's breaking away from her at the bed-room door and the shooting she did not hear Saaf speak.

Dan DeVelin testified that while he was on the front porch of his niece's house, which was next door north of the Pokosa home, he observed the arrival of the Saaf car. What first attracted his attention was Estelle Saaf being alone on the Pokosa porch and entering the house. DeVelin said that he then saw Saaf and Pokosa coming up the walk leading to the house. The two came up to the steps, Saaf entering first, and as Saaf entered the house DeVelin observed Pokosa had a revolver in his hand. When DeVelin saw the gun he stepped inside and spoke to someone in the house, and on looking out again he saw Estelle come to the window, raise it and jump out. As she jumped he heard her scream and also heard the first shot, followed in about five seconds by a second shot. Shortly afterward he heard a banging noise.

Immediately after the killing Pokosa fled from the scene by way of the back door and up an alley. About nine o'clock that evening he was seen at the residence of William Wishard, in Rockford. Pokosa said to Wishard, "I didn't mean to kill him; I am sorry; I just meant to scare him," and then requested Wishard to hide him or let him sleep in the basement of Wishard's house until he could get his check, change clothing and leave town, and it was here that he was taken into custody.

A 38-calibre revolver with which it was alleged the shooting was done was found by a policeman under the cushion of a large chair in Pokosa's house, and when found it had three empty and two loaded cartridge cases in its magazine. It was also discovered that the banging noise described by DeVelin had evidently been made by Pokosa in breaking down the bed-room door which Estelle had locked before she jumped out of the window.

The evidence discloses that Pokosa harbored ill-will toward Saaf and on several occasions had made threats to

kill him. Soon after Saaf's engagement to Estelle her father told Saaf's father: "That has got to be broken up; I will never stand for it; if he don't keep away from my daughter I will hurt him; I might do something to harm him, and if there is no other way to stop it a bullet will stop it." He told Mrs. Arvid Saaf, mother of deceased, that he did not like her son, and that if he married his daughter he would rob her of three things: her nationality, her family and her religion. He told Ben Skeyhan, his next door neighbor, that he did not like the idea of his daughter marrying Saaf, and "if Saaf ever entered his house he would get him." He went to the radio shop and inquired for Saaf the day following his daughter's elopement, saying to Gwendolyn Lundin, the book-keeper: "He took my girl; I am Estelle's father; I'll get him." While talking to William Wishard, a contractor, in the middle of the week preceding May 4, he said if "Saaf stole his daughter away and married her he would kill the son-of-a-bitch." In a conversation with Augusta Honl, a girl friend of Estelle's, on the evening of Friday, May 2, he said that unless his daughter came back she would be a widow within a couple of days.

At the trial the defense was that Pokosa was insane when he killed Saaf, and evidence was introduced to show how he acted and talked during the week before the killing. Frank A. Culhane, a real estate man, testified that Pokosa came to his office a day or two before May 4 to have his house sold, and he said Pokosa was broken-hearted about his daughter being kidnapped by Saaf and seemed nervous and excited and in the judgment of witness was then insane. R. J. Cannell, an attorney who was visited by Pokosa on Friday before May 4 and who had advised him on other occasions, related certain excited talk and nervous conduct on the part of Pokosa, who in his opinion was "nuts." Witness related similar spells Pokosa had on former occasions, and said he did not report his conduct to anyone

because he thought he would be all right when he cooled off. Robert J. Ferguson, manager of the shop where Pokosa worked, testified that .Pokosa made mistakes in his work during the week preceding May 4, and that on one occasion he was taken ill and went to a hospital. This sickness was in February, 1930, when he went to the hospital for about ten days and was treated for neuritis and infected teeth by Dr. Christenson. He also testified that during the week Pokosa left the store on several occasions and had not done so before. Edward Lundstrom testified that on Saturday evening, May 3, he saw Pokosa on his porch chewing tobacco and spitting on and off the porch and nervously walking back and forth, sometimes wringing his hands. Lundstrom and Ferguson, both lay witnesses, testified that in their opinion Pokosa was insane at times during the week before Saaf was killed.

In rebuttal, Walter Julian, coroner, testified, by way of impeachment, to a conversation had with Robert J. Ferguson, one of Pokosa's witnesses, on Monday following May 4, to which conversation the attention of Ferguson had been called in his testimony and he had denied making the statement. Julian testified that Ferguson had stated that he was very much surprised by the shooting and that he never had thought there was anything wrong with Pokosa. He also testified that he did not on that Monday hear Ferguson say, either to him or the assistant State's attorney, that he believed Pokosa was crazy. This witness also testified that he saw Pokosa the night of the day of the shooting and again the next morning, and heard him questioned and saw his actions, and from what he saw and heard on each occasion it was his opinion that outside of a little nervousness he was normal. Laurence Hare, who was employed at the same place as Pokosa and who had associated with him for some time, and particularly had a conversation with him about 9:30 the night before May 4, which conversation he related, stated that in his opinion

Pokosa was sane at that time. Albert Christenson, a physician and surgeon, testified that he was the physician who treated Pokosa at his office and at St. Anthony's Hospital, and that such treatment was for neuritis and some infected teeth, as shown by his diagnosis of Pokosa's ailment at the time. On cross-examination this witness testified that at that time Pokosa was run down, nervous and unstrung; that he did not remember advising him to go to Wilgus Sanitarium, but he may have, and that it was hard to say whether he was sane or insane, as he did not profess to have any knowledge of psychiatry. He also testified that he observed Pokosa to be of a nervous temperament. Folke Bengston, the police officer who arrested Pokosa, testified that he had a conversation with him at the time and observed him while riding in the patrol wagon. He testified that from observing Pokosa at the time it was his opinion he was sane.

In addition to the forms of verdict the trial court gave eleven instructions for the People and twenty-two for Pokosa and refused four instructions offered by Pokosa, including a form of verdict on manslaughter. The refusal of the court to give the instruction on manslaughter is one of the principal errors assigned and argued by counsel for Pokosa as ground for reversal. From a review of the record we are convinced that the trial court committed no error in refusing to give an instruction on manslaughter, as the evidence did not justify such an instruction. The evidence is undisputed that Pokosa killed Saaf, and he himself admitted the killing when seeking refuge shortly afterwards at the home of Wishard. There is no evidence that such killing was either accidental or in self-defense, but, on the contrary, the record indicates that Pokosa had made numerous threats to take the life of Saaf if he married his daughter. The two cases relied upon by Pokosa, *People v. Cox,* 340 Ill. 111, and *People v. White,* 311 id. 356, are not in point. In each of thoses cases the court gave instruc-

tions on the subject of manslaughter as well as murder, while in the present case the court refused to give an instruction on manslaughter. In each of the cases cited the defendant objected to the giving of such instructions, claiming that there was no evidence on which to base the manslaughter instruction, and if he was guilty of any crime it was murder, while in the case at bar it is claimed that Pokosa, if guilty at all, was only guilty of manslaughter. Iu each of the cases cited this court held that the trial court could properly give an instruction that the accused may be found guilty of a lesser offense embraced in the crime charged if there is evidence on which to base the instruction, even though there was also evidence that the crime charged was committed. In the present case there was no evidence on which to base a manslaughter instruction, and as said in *People* v. *White, supra:* "It is undoubtedly true that when the charge is murder and the evidence conclusively shows the crime committed was murder it would not be proper to instruct that the accused might be found guilty of a lesser offense." Likewise in *People* v. *Hauke,* 335 Ill. 217, where the defendant was refused instructions on manslaughter, this court held that it is not error to refuse to give an instruction as to manslaughter, or as to the form of verdict for manslaughter, when there was no evidence upon which a verdict of manslaughter could be based. It is fundamental that upon the trial of an issue of fact it is erroneous to give instructions not based upon any evidence, (*People* v. *Schultz,* 267 Ill. 147,) and where the evidence admits only the one conclusion that the crime was murder, it is error to give an instruction authorizing a verdict for a lesser offense. *People* v. *Tokoly,* 313 Ill. 177; *People* v. *Grant,* 313 id. 69; *People* v. *Brown,* 326 id. 640; *People* v. *Krauser,* 315 id. 485.

It is further claimed that there was reasonable doubt as to the sanity of Pokosa at the time he killed Saaf. Pokosa did not testify on the trial, and those who testified

as to his mental condition were all lay witnesses, who related various actions and conversations of Pokosa during the week preceding the tragedy on which they based opinions that he was insane. For the most part these witnesses testified that Pokosa was highly nervous, unstrung and in an excited and emotional frame of mind over the elopement of his daughter with Saaf, which he characterized as a "kidnapping." He was shown to be in a weakened and run-down condition physically, and about two months before he had spent ten days in a hospital for neuritis and infected teeth. In rebuttal the People presented the evidence of an equal number of witnesses who testified that from their observations both before and after the killing of Saaf, Pokosa, in their opinion, was sane. The coroner, Walter Julian, testified that he observed Pokosa after his arrest on the day of the shooting and the following morning when he was questioned about the homicide; that he heard Pokosa talk and observed his conduct at that time, and outside of a little nervousness he appeared perfectly normal. Laurence Hare, who was employed at the same store with Pokosa, testified that he was with him and had a conversation with him at about ten o'clock on Saturday, May 3, and that from his conversations he believed he was sane on the night before the shooting. Folke Bengston, the officer who took Pokosa to the police station after his arrest on Sunday, May 4, testified that he rode beside him and had a conversation with him and in his opinion he was sane. Harold Barker, jailer, also testified for the People that he had noticed Pokosa's physical condition while he was imprisoned, and that since his incarceration he had gained from eight to ten pounds in weight. Thus it will be seen that the question of Pokosa's insanity was a question of fact which the jury was called upon to determine from the evidence, and nothing is presented by the record which would warrant us in disturbing its conclusion on this point. The evidence indicates that Pokosa was highly

nervous and possibly lacked self-control, but there are many sane persons who occasionally exhibit these same traits and they do not necessarily show a deluded mind. (*People* v. *Ortiz*, 320 Ill. 205.) The jury saw the witnesses and heard the testimony, and its verdict expressing belief that Pokosa was sane at the time he killed Saaf will not be disturbed.

Other errors are assigned contending that there was a reasonable doubt as to the guilt of the defendant of murder; that the presumption of innocence in behalf of the defendant was not sufficiently overcome by the evidence to warrant a verdict of murder, and that the court erred in admitting certain evidence for the People and in rejecting evidence offered on behalf of the defendant. We have carefully examined the record on these points and find no grounds for reversal. The instructions given by the court correctly stated the law where insanity was offered as a defense and the court's rulings upon the evidence show that the defendant had a fair trial. No evidence appears in the record to show any justification, by way of quarreling, self-defense or accident, which would excuse the defendant for his admitted killing of Saaf. The evidence shows that he had repeatedly threatened to kill Saaf if he married his daughter and that he decoyed Saaf into his home with that deliberate purpose in view and there carried it out. This court is not warranted in any case in setting aside the finding of a jury that the defendant is guilty, where no reversible errors have been committed, unless the finding is so palpably contrary to the evidence or so unsatisfactory as to justify the conclusion that there is a reasonable doubt of his guilt. (*People* v. *Thompson*, 321 Ill. 594; *People* v. *Rembowicz*, 335 id. 604.) The evidence in this case is amply sufficient to warrant the verdict of the jury.

The judgment of the circuit court is therefore affirmed.

*Judgment affirmed.*