(No. 58586.— ▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DOMINGO PEREZ, Appellant.

*Opinion filed July 17, 1985.—Rehearing denied September 27, 1985.*

SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, of Springfield, and Verlin R.F. Meinz, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Edward Petka, State's Attorney, of Joliet (Mark L. Rotert and Michael V. Accetteira, Assistant Attorneys General, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Defendant, Domingo Perez, an inmate at the Stateville Correctional Center, was charged under an indictment with the murder of Richard Cook, a fellow inmate. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2).) Following a jury trial in the circuit court of Will County, defendant was found guilty of murder. At a bifurcated sentencing hearing, the same jury found the existence of a statutory aggravating factor (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(2)), and concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the trial court sentenced defendant to death. The sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). For the reasons set forth

below, we affirm defendant's conviction and sentence.

On the evening of April 16, 1981, approximately 140 Stateville inmates were watching a movie in a section of the institution called the Movie Hall. Inmate Anthony Beamon, meanwhile, was mopping the floor in an area known as the C House Tunnel, which was located a short distance from the Movie Hall. Beamon was the only eyewitness to the attack on Cook to testify. Beamon recounted that, when the movie ended at about 7:30 p.m., he observed Cook leave the hall "walking kind of fast." A group of seven or eight other inmates followed Cook and surrounded him in the C House Tunnel. Several members of the group—one of whom Beamon identified as defendant—were armed with homemade knives and began swinging at Cook. Because Cook was in the middle of the group, Beamon was unable to see anyone actually stab him. Beamon testified, however, that he saw defendant twice raise a knife above his head and strike at Cook with a downward motion. The attackers then ran out of the tunnel into the corridor outside the Movie Hall.

Several correctional officers quickly arrived on the scene. As two of the officers assisted Cook past a group of inmates, Cook identified Hector Rivera as one of his attackers. He then pointed at defendant and said, "That's one of them." Cook, now bleeding profusely, began fighting with defendant. Correctional officers immediately separated the two, after which Cook was taken to a nearby hospital where he died on the operating table shortly after 9 p.m.

William Price, a member of the Internal Investigation Unit at Stateville, interrogated defendant on two occasions, once on the night of the murder and again almost a month later. Price testified that defendant first told him that during the movie he heard Cook cry out that he had been stabbed. Defendant went to help Cook, but

Cook pushed him away and ran out of the Movie Hall. Defendant pursued Cook, and as he (Cook) was bending over, defendant stabbed him once or twice and threw his knife down the C House Tunnel. At the second interrogation, defendant stated that toward the end of the movie he observed Hector Rivera stab Cook twice in the back and inmate Sam Pacheco stab him once in the neck. Rivera and Pacheco then ran out of the Movie Hall pursued by Cook. Defendant ran after Cook and stabbed him in the left side while Cook was fighting with Rivera. He then threw his knife down the C House Tunnel.

Price further testified that during the second interrogation defendant admitted that a knife recovered from the C House Tunnel belonged to him. Price also said defendant denied any knowledge of a planned attack on Cook.

Dr. Edward Shalgos, who performed the autopsy, testified that Cook had been stabbed four times; once in the back of the neck, twice in the back and once in the left side of the chest. The neck and back wounds all had penetrated at a downward angle but were only superficial and could not have caused Cook's death. Dr. Shalgos testified the fatal wound resulted from a sharp cutting type instrument which was plunged horizontally deep into the left side of the chest, causing massive internal bleeding. When shown the knife which defendant acknowledged was his, Dr. Shalgos stated that it was "most highly compatible" with the fatal wound. It could have also caused two of the nonfatal wounds, he said, but that was less likely considering both the nature of those wounds and the characteristics of the knife.

Under cross-examination, the doctor testified that, if Cook had been standing, the fatal wound could not have been inflicted by a downward motion. Rather, the horizontal trajectory of the wound was consistent with a "forward thrust" of a person standing to Cook's side;

however, it was possible that the fatal blow was inflicted by someone standing behind the victim.

The State also established that blood found on defendant's clothing could not have come from defendant, but was consistent with Cook's blood type. The same finding was also made with respect to blood found on the knife recovered from the C House Tunnel.

Following the presentation of the foregoing evidence—none of which is disputed—a conference on jury instructions was held. Asserting that the evidence was sufficient for the jury to find him guilty of only aggravated battery, defendant tendered an instruction relating to that offense. The State objected, and after lengthy arguments the court ruled it would not give the requested instruction.

Defendant now claims the court's failure to give the aggravated-battery instruction deprived him of a fair trial. Defendant's position is that aggravated battery is a lesser included offense of murder and that, considering the evidence, he was constitutionally entitled to an instruction on the lesser offense. In support defendant cites *Beck v. Alabama* (1980), 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382, wherein the Supreme Court held that in a capital case due process entitles the accused to an instruction on any noncapital offense which is supported by the evidence. The court reasoned:

> "[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake." 447 U.S. 625, 637, 65 L. Ed. 2d 392, 402-03, 100 S. Ct. 2382, 2389.

In the instant case defendant points out that while the evidence clearly established that he stabbed Cook, it also showed that other inmates participated in the attack. Relying on Beamon's eyewitness testimony describing how defendant struck at Cook with a downward motion from overhead and on Dr. Shalgos' testimony that the fatal wound could not have been inflicted by a downward blow, defendant argues the jury could have found he did not cause the fatal wound. Moreover, he maintains that, because there was no evidence of any preconceived plan or agreement to kill Cook, he was not accountable for the actions of the other inmates who took part in the attack. Consequently, defendant contends the jury could have convicted him of aggravated battery, but it was denied that option when the court refused to give the aggravated-battery instruction.

Assuming that aggravated battery is a lesser included offense of murder, under the facts of this case we cannot agree with defendant's claim that he was constitutionally entitled to an aggravated-battery instruction. In *Hooper v. Evans* (1982), 456 U.S. 605, 72 L. Ed. 2d 367, 102 S. Ct. 2049, the Supreme Court made clear that an included-offense instruction is required only in cases where the jury could rationally find the defendant guilty of the lesser offense and not guilty of the greater offense. 456 U.S. 605, 612-13, 72 L. Ed. 2d 367, 373-74, 102 S. Ct. 2049, 2053-54. Accord, *People v. Lockett* (1980), 82 Ill. 2d 546, 550-51; *People v. Simpson* (1978), 74 Ill. 2d 497, 500-01; *People v. Pokosa* (1930), 342 Ill. 404, 411.

In this case the jury could not have rationally found defendant guilty of aggravated battery. The record shows the State presented alternative theories to establish defendant's guilt. It first asserted defendant was directly responsible for Cook's death. This theory was premised on (1) defendant's statement to Price in which he said he stabbed Cook in the left side while Cook was fighting with

Rivera, and (2) Dr. Shalgos' testimony that defendant's knife was "most highly compatible" with the fatal wound. Clearly, under the direct-responsibility theory the jury could only have found defendant either guilty or not guilty of murder.

Even if defendant had not inflicted the fatal wound, the prosecutor told the jury, he was nevertheless responsible for Cook's death under the theory of accountability. Evidence supporting this theory consisted of Beamon's testimony, describing how defendant and a number of other inmates surrounded and stabbed Cook in the C House tunnel. Defendant, too, relies on Beamon's testimony, arguing that it, together with a portion of Dr. Shalgos' testimony, supports his claim that he could not have inflicted the fatal wound. Yet, it was immaterial whether or not defendant inflicted the wound which resulted in Cook's death, for, through Beamon, the State established elements necessary for finding defendant accountable for the actions of the other inmates who took part in the attack.

Section 5—2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1979, ch. 38, par. 5—2(c).) Defendant does not dispute his active participation in the stabbing but asserts, without citing any authority, that he cannot be held accountable because there was no showing that he acted pursuant to a preconceived plan or agreement to kill Cook. Such a showing is not required. As this court said in *People v. Johnson* (1966), 35 Ill. 2d 624, 626:

> "Evidence that one voluntarily attaches himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain a conviction as a principal for a

crime committed by another in furtherance of the venture. (*People v. Rybka,* 16 Ill. 2d 394, 405.) Proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by a group, and *the fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. (People v. Richardson,* 32 Ill. 2d 472, 476.)'' (Emphasis added.)

(See also *People v. Hamilton* (1981), 100 Ill. App. 3d 942, 950-51; *People v. Jovicevic* (1978), 63 Ill. App. 3d 106, 114; see *People v. Sink* (1940), 374 Ill. 480; *People v. Barrett* (1913), 261 Ill. 232; *Ritzman v. People* (1884), 110 Ill. 362.) Thus, even though defendant's actions may have been spontaneous, his participation in the stabbing made him legally accountable for the actions of every other member of the group.

Like the evidence supporting the direct-responsibility theory, the evidence underlying the accountability theory precluded any possibility of the jury finding defendant guilty of aggravated battery. In other words, defendant was either guilty or not guilty of murder. The trial court therefore did not err in refusing to give defendant's tendered instruction.

Defendant next alleges that the qualification of jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, results in a jury biased in favor of the prosecution. We rejected this argument in *People v. Collins* (1985), 106 Ill. 2d 237, 278, *People v. Stewart* (1984), 105 Ill. 2d 22, 67, and *People v. Lewis* (1981), 88 Ill. 2d 129, 147, and see no reason to depart from our holdings in those cases. There were no other challenges to defendant's conviction.

Defendant contends his death sentence must be vacated because the State introduced irrelevant and prejudicial evidence during the first phase of the sentencing hearing. In

order to establish that defendant had attained the age of 18 when he murdered Cook, the State called Thomas Johnson, a Chicago police detective, to the stand. Johnson testified briefly, telling the jury that he arrested defendant in 1978 for armed robbery and that during his subsequent interrogation, defendant said he was born on May 24, 1960. It was improper during the first phase of the hearing, defendant maintains, for the State to elicit that he had been arrested for armed robbery. Defendant, however, did not object to the portion of Johnson's testimony of which he now complains, and thus the issue is not properly before this court. *People v. Carlson* (1980), 79 Ill. 2d 564, 575-76.

Defendant contends an additional error occurred at the first phase of the sentencing hearing when the court prevented defense counsel from making a relevant argument in mitigation. During his closing remarks, defense counsel, referring to Beamon's testimony, told the jury that defendant "may not have been the one that inflicted the wounds to the left side." The State's objection to this argument was sustained. We find no error in the court's ruling.

The first phase of a bifurcated sentencing hearing deals solely with the question of whether the defendant is eligible to receive the death penalty. (*People v. Davis* (1983), 97 Ill. 2d 1, 26.) The State must prove beyond a reasonable doubt one of the statutory aggravating factors enumerated in section 9—1(b) and that the defendant had attained the age of 18 when he committed the offense. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b).) The cause then proceeds to the second or aggravation/mitigation phase, where the jury weighs the aggravating and mitigating factors to determine whether or not the defendant should be sentenced to death.

In this case the jury had just convicted defendant of murdering a fellow inmate. That he may not have inflicted the fatal wound was irrelevant to the determination of his

eligibility to receive the death penalty. Rather, it was a mitigating factor which could properly be argued during the second phase as militating against the imposition of the death penalty. Because defense counsel's argument occurred during the eligibility phase, the court did not err in sustaining the State's objection.

The defendant next contends that the trial court erred by allowing unreliable hearsay testimony during the second phase of the sentencing hearing. The first instance complained of occurred during the State's direct examination of Department of Corrections Officer John Stovall. Officer Stovall testified that on March 15, 1983, while on duty in Stateville Unit C, he was confronted by the defendant. The defendant questioned Stovall concerning a disciplinary ticket Stovall had previously written the defendant for being on "one gallery" when his cell was located on "three gallery." Stovall testified that the defendant stated "that will be the last ticket you write me, and you will see me on one gallery again." Officer Stovall then told the defendant to accompany him to the superintendent's office, but the defendant instead made an obscene remark and ran away. Officer Stovall reported the incident to his superior, Captain McCollough, who placed the defendant in the segregation unit. Office Stovall testified that he wrote the defendant a disciplinary ticket for intimidation and threats concerning the incident and delivered it to him in the segregation unit. Upon receiving the ticket the defendant told Stovall, "I'll get out of here and when I do I'm going to get you." Officer Stovall then issued the defendant another ticket for intimidation and threats.

Officer Stovall further testified that an inmate named Krespo, who was the apparent leader of the Latin Kings gang at Stateville, asked to speak to Captain McCollough concerning the defendant. Before speaking with Captain McCollough, Krespo requested that Officer Stovall leave the office, which he did. Officer Stovall testified that Cap-

tain McCollough later related Krespo's conversation to him. The State asked Stovall, "What was the conversation?" Before Stovall could answer, the defense objected to the question. The judge overruled the objection and allowed Stovall to answer.

Stovall stated that Krespo warned Captain McCollough not to bring the defendant back in Unit C because something was going to happen and when asked if he meant to Officer Stovall, he replied "possibly." Stovall also stated that Krespo told McCollough that the defendant "was some of my people, but I have no control over him. That he is a little crazy." The defendant did not object to the answer nor did he move to have any portion of it stricken and disregarded by the jury as being unreliable.

It is well established that section 9—1(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e)) allows for the introduction of evidence during the second stage of the sentencing hearing regardless of whether it would be admissible during the guilt phase of the trial. (*People v. Lyles* (1985), 106 Ill. 2d 373, 414; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 65; *People v. Free* (1983), 94 Ill. 2d 378, 421-27.) The factors controlling the admission of evidence at the second stage of the sentencing hearing are relevance and reliability. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 65; *People v. Free* (1983), 94 Ill. 2d 378, 426-27.) Thus the mere fact that the testimony presented contains hearsay does not make it *per se* inadmissible (*People v. Brisbon* (1985), 106 Ill. 2d 342, 365; *People v. Lyles* (1985), 106 Ill. 2d 373, 414; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 64-65), nor does it deny the defendant his right to confront witnesses. See *People v. Brisbon* (1985), 106 Ill. 2d 342, 365; *People v. Lyles* (1985), 106 Ill. 2d 373, 415-16; *People v. Davis* (1983), 95 Ill. 2d 1, 47.

The trial court's ruling on the initial question asked by the State was proper. The fact that the answer to the question contained the hearsay statements of McCullough

did not make it *per se* objectionable. Portions of the answer contained hearsay testimony concerning the defendant being a threat to Officer Stovall's safety. Such evidence was clearly relevant as an aggravating factor at the second stage of the hearing. The evidence was also reliable in that it was corroborated by Officer Stovall's testimony concerning the defendant's direct threats against him and by the fact that the prison authorities disciplined the defendant because of the threats. Thus these statements of McCullough to Stovall were admissible.

Defendant argues that the portion of Officer Stovall's answer concerning Krespo's statement that the defendant was "uncontrollable" and "a little crazy" was unreliable and thus inadmissible. The defendant, however, did not move to strike, nor did he object to any of the alleged inadmissible portions of the answer he now contends were inadmissible. The objections had been the hearsay nature of the statement. Since hearsay evidence is not objectionable *per se* at this phase, the court properly overruled the objection. If defendant felt that the answer would contain inadmissible statements judged by the standards of relevancy and reliability, he should have made these known to the judge or moved to strike the answer. If a motion to strike or an objection to the answer had been made, the trial court could have ruled on the reliability of the portions of the answer now complained of. Not having given the trial court the opportunity to rule on the admissibility of the complained of portions of the answer, the defendant has waived the right to raise that issue here. *People v. Free* (1983), 94 Ill. 2d 378, 425; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.

The defendant also contends that inadmissible hearsay was introduced during the testimony of Thomas McWilliams, Chief Investigator in the Internal Investigation Unit at Stateville. Investigator McWilliams stated that the day after inmate Cook's murder the leader of the Simon City

Royals, Inmate Donald Miller, asked to speak with him. McWilliams testified that his conversation with Miller concerned a shift in allegiance made by the Simon City Royals shortly before Cook's murder. Miller stated that the Royals had previously been aligned with the Disciples for protection but had recently shifted their alliance to the Gangster Organization. McWilliams testified that Miller felt that the change in alliance was responsible for Cook's death because after the shift the Latin Kings felt free to assault members of the Simon City Royals. McWilliams also stated that, prior to Cook's murder, Miller had been warned by unidentified members of the Latin Kings that the Kings were "preparing their assault."

Again, the factors controlling the admission of evidence at the second stage of the sentencing hearing are relevancy and reliability, the determination of which lies within the sound discretion of the trial judge. (*People v. Lyles* (1985), 106 Ill. 2d 373, 414; *People v. Free* (1983), 94 Ill. 2d 378, 423-24.) In the present case the evidence established that the defendant was a self-proclaimed "soldier" and "loyal member" of the Latin Kings. The evidence also established that his victim, Richard Cook, was a member of the Simon City Royals and that the Royals and the Latin Kings were enemies both on the street and in prison. Given these facts we do not believe the trial court abused its discretion in allowing Investigator McWilliams' testimony. (See *People v. Lyles* (1985), 106 Ill. 2d 373, 414-15; *People v. Free* (1983), 94 Ill. 2d 378, 423-24.) Furthermore, most of the witnesses' testimony concerning inmate Miller's statement was not objected to. After much of the testimony had been given, defendant objected but on the basis that the question called for speculation.

Defendant next contends that the trial court erred by denying his request, at the second stage of the sentencing hearing, to introduce a sworn affidavit in lieu of testifying. The affidavit was composed and signed by the defendant

and outlined the difficulties he had experienced during his life. The affidavit also expressed the defendant's desire to serve out his sentence and someday lead a normal life. The defendant was questioned by defense counsel outside the presence of the jury concerning his decision not to testify and his desire to present the affidavit to the jury. The State objected to the introduction of the affidavit, and the trial court sustained the objection.

Defendant argues that the affidavit was admissible pursuant to section 9—1(e) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38 par. 9—1(e)) because it was reliable and relevant mitigating evidence. However, as we stated in *People v. Gaines* (1981), 88 Ill. 2d 342, 376, section 9—1(e) does not provide "that the defendant be given an opportunity to speak other than as a witness. A defendant in a criminal proceeding who testifies in his own behalf is subject to reasonable cross-examination (*People v. Miller* (1930), 342 Ill. 244, 252; *McGautha v. California* (1971), 402 U.S. 183, 215, 28 L. Ed. 2d 711, 731, 91 S. Ct. 1454, 1471), and no reason appears why an exception to that principle should be read into section 9—1(e) by implication." We have consistently rejected the argument that a defendant has the right, at the second stage of the sentencing hearing, to make an unsworn statement to the jury and thus escape cross-examination. (*People v. Williams* (1983), 97 Ill. 2d 252, 303-04; *People v. Gaines* (1981), 88 Ill. 2d 342, 374-80.) Although in the present case the affidavit was arguably a "sworn statement," it is clear that the defendant's purpose for introducing it was to address the jury without being subjected to cross-examination. The defendant had no right to address the jury other than as a witness, subject to cross-examination and thus the trial court was correct in excluding the affidavit. *People v. Gaines* (1981), 88 Ill. 2d 342, 376.

The defendant also argues that his death sentence should be overturned because the trial judge "repeatedly"

misinformed the jury that they would "recommend" whether the death penalty should be imposed. In support of this argument the defendant cites the recent decision of the United States Supreme Court in *Caldwell v. Mississippi* (1985), 472 U.S. ___, 86 L. Ed. 2d 231, 105 S. Ct. 2633. In *Caldwell*, the prosecutor in a capital case told the jury in closing argument at the sentencing hearing that "they [the defense attorneys] know that your decision is not the final decision. *** Your job is reviewable." (472 U.S. ___, ___, 86 L. Ed. 2d 231, 237, 105 S. Ct. 2633, 2637.) The statement was objected to, but the trial judge allowed the prosecutor to continue, stating, "I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands." The prosecutor continued and later stated "the decision you render is automatically reviewable by the Supreme Court." (*Caldwell v. Mississippi* (1985), 472 U.S. ___, ___, 86 L. Ed. 2d 231, 237, 105 S. Ct. 2633, 2638.) Based on these statements, the United States Supreme Court vacated the imposition of the death sentence, holding that it was "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi* (1985), 472 U.S. ___, ___, 86 L. Ed. 2d 231, 239, 105 S. Ct. 2633, 2639.

In the present case the record does not support any inference that the jury was misled to believe that the responsibility for imposing the death sentence rested elsewhere. A review of the record shows that the trial judge and the prosecutor each used the word "recommend" only once during the sentencing hearing. The trial judge correctly instructed the jurors at the second stage of the sentencing hearing that if they signed the verdict form "which states that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence on the

defendant" then "the court *must* sentence the defendant to death." (Emphasis added.) The verdict form signed by the jury stated:

"We unanimously conclude that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence upon the defendant Domingo Perez and *that the court shall sentence him to death.*" (Emphasis added.)

Given the limited use of the word "recommend" at the sentencing hearing and the fact that the jury's role was clearly and correctly stated in both the judge's instructions to the jury and on the verdict form which each of the jurors signed, we do not believe that the jurors in this case could have been confused as to their responsibility in imposing the death penalty.

The other "repeated" instances of the trial judge's use of the word "recommend" occurred during the questioning of prospective jurors on *voir dire*. Again, it is clear from the record that, at the beginning of *voir dire*, the trial judge correctly informed the members of the panel of their role. It is also apparent from the answers given by some of the jurors that they understood their role in the sentencing process. Finally, defendant's trial counsel did not object to the trial court's use of the word "recommend" and, in fact, used it several times himself during *voir dire*. In light of these facts, we believe that the issue of the use of the word "recommend" during *voir dire* is waived on appeal and does not constitute plain error. See *People v. Free* (1983), 94 Ill. 2d 378, 425; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.

Following the presentation of aggravating and mitigating evidence, the court instructed the jury, *inter alia,* that "[n]either sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry." (See Illinois Pattern Jury Instruction, Criminal, No. 1.01(5) (2d ed. 1981).)

Defendant now claims it was erroneous to give this instruction because the jury should have been allowed to consider sympathy in determining whether or not to impose the death penalty. Defendant, however, failed to object to the instruction at the jury instruction conference and thus is precluded from raising his claim here. (*People v. Lewis* (1981), 88 Ill. 2d 129, 149.) Moreover, in *People v. Stewart* (1984), 104 Ill. 2d 463, 494, we specifically held that the giving of this instruction is not improper.

The defense next contends that the imposition of the death penalty on Domingo Perez was arbitrary, disproportionate and excessive. Defendant argues that the sentence is disproportional because there are other inmates who have killed while in prison but have not received the death penalty. Defendant also argues that the sentence is disproportional because the other inmates who were involved in the stabbing have not received the death penalty. Hector Rivera, the only other inmate charged in this incident, was convicted in a separate trial, found eligible for the death penalty, but did not receive it. Defendant argues that we should compare the factors relied on in aggravation and mitigation in the present case to those in cases where a defendant has killed in prison but has not received the death penalty. By defendant's reasoning we would reverse his death sentence if we felt that any of the other defendants who have killed in prison were as deserving or more deserving than he is of the death penalty. We disagree.

The United States Supreme Court has held that the Constitution does not require "a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with penalties imposed in similar cases." (*Pulley v. Harris* (1984), 465 U.S. 37, 44, 79 L. Ed. 2d 29, 36, 104 S. Ct. 871, 876; see also *People v. Stewart* (1984), 104 Ill. 2d 463, 499.) As stated in *Pulley*

*v. Harris,*

>"Any capital sentencing scheme may occasionally produce aberrational outcomes. Such inconsistencies are a far cry from the major systematic defects identified in *Furman* [*Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726]. As we have acknowledged in the past, 'there can be "no perfect procedure for deciding in which cases governmental authority should be used to impose death." ' [Citations.]" (465 U.S. 37, 54, 79 L. Ed. 2d 29, 42, 104 S. Ct. 871, 881.)

Thus, the fact that a separate jury found there were mitigating factors sufficient to preclude the imposition of the death penalty as to Hector Rivera does not mean that we must set aside the jury's determination in the present case that as to Domingo Perez there was no mitigating factor or factors sufficient to preclude its imposition.

Determining whether a death sentence is proper in a particular case "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; see Ill. Const. 1970, art. I, sec. 11; *People v. Free* (1983), 94 Ill. 2d 378, 428.) A sentence does not offend the proportionality requirement if it is commensurate with the seriousness of the crimes and gives adequate consideration to any relevant mitigating circumstances, including the rehabilitation potential of the defendant. (*People v. Free* (1983), 94 Ill. 2d 378, 428-29; *People v. Carlson* (1980), 79 Ill. 2d 564, 587.) This court acknowledges the necessity to avoid arbitrary or capricious death sentences by adequately defining capital crimes, by directing sentencing discretion, and by providing adequate judicial review. *People v. Free* (1983), 94 Ill. 2d 378, 429; *People v. Lewis* (1981), 88 Ill. 129, 164-65.

During the second stage of the sentencing hearing the

State introduced evidence that the defendant had prior convictions for armed robbery and purse snatching. During the commission of the armed robbery the defendant held a scissors blade to the victim's neck while an accomplice went through the victim's pockets. The jury was also informed that while in prison the defendant had received disciplinary citations on various occasions for carrying a homemade knife and had also threatened to "get" a prison guard who wrote him a citation. The jury was also aware of the brutal and senseless nature of the defendant's murder of inmate Cook in the present case. Our responsibilities neither require nor permit reversal where no reasonable doubt of guilt exists, no reversible error has occurred, and there is no indication that the jury has imposed the penalty in an arbitrary, capricious or uneven manner. (*People v. Free* (1983), 94 Ill. 2d 378, 430.) From a review of the evidence introduced in aggravation and mitigation and the testimony at trial we do not believe that the death penalty was imposed on Domingo Perez in an arbitrary, capricious or uneven manner.

Defendant also argues that the death penalty was arbitrarily imposed because the imposition of the death penalty in Illinois is limited to those individuals who speak English and do not suffer from communicative disorders. Defendant argues that he had a limited understanding of English and that had his language problems been somewhat more severe he could not have been sentenced to death. Defendant's argument misconstrues the purpose and effect of sections 104—22(b) and 104—26(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat., 1980 Supp., ch. 38, par. 104—22(b); 104—26(b)). Section 104—22 provides in pertinent part:

> "(a) On motion of the defendant, the State or on the court's own motion, the court shall determine whether special provisions or assistance will render the defendant fit to stand trial as defined in Section 104—10.

(b) Such special provisions or assistance may include but are not limited to:

(1) Appointment of qualified translators who shall simultaneously translate all testimony at trial into language understood by the defendant.

(2) Appointment of experts qualified to assist a defendant who because of a disability is unable to understand the proceedings or communicate with his or her attorney." (Ill. Rev. Stat., 1980 Supp., ch. 38, par. 104—22.)

Section 104—26(b) provides that a person who is convicted following a trial under section 104—22 shall not be eligible for the death penalty.

Contrary to defendant's argument, the provisions of section 104—22 are not related to the needs of an accused who simply is non-English-speaking. (*People v. Stewart* (1984), 104 Ill. 2d 463, 501.) The history of section 104—22 is set out in *People v. Stewart* and need not be repeated here. Suffice to say that article 104 of the Code of Criminal Procedure of 1963 pertains to fitness to stand trial, and pursuant to section 104—10 (Ill. Rev. Stat., 1980 Supp., ch. 38, par. 104—10) a person is unfit if, because of his mental or physical condition, he cannot understand the proceedings and assist in his defense. (*People v. Stewart* (1984), 104 Ill. 2d 463, 500.) The problem of individuals who are simply non-English-speaking is met by section 1 of "An Act relating to the appointment of interpreters ***" (Ill. Rev. Stat. 1979, ch. 38, par. 165—11), which provides for interpreters for defendants without an adequate understanding of English. (*People v. Stewart* (1984), 104 Ill. 2d 463, 501.) Section 104—26(b) does not exempt persons who are simply non-English-speaking from the death penalty and does not act to make the imposition of the death penalty in Illinois arbitrary, capricious or disproportionate. *People v. Stewart* (1984), 104 Ill. 463, 499-502.

Defendant next raises several constitutional challenges to our death penalty statute. He asserts there is no provi-

sion for adequate appellate review to ensure that the death penalty is not imposed arbitrarily. Additionally, he maintains our statute is unconstitutional because it fails to require the State to prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude the imposition of the death penalty. We rejected these arguments in *People v. Mack* (1984), 105 Ill. 2d 103, *People v. Kubat* (1983), 94 Ill. 2d 437, and *People v. Brownell* (1980), 79 Ill. 2d 508, and adhere to our holding in those cases. Further, we have held that the discretion vested in the State's Attorney to determine whether to seek the death penalty is not an unconstitutional delegation of legislative and judicial authority. (*People v. Stewart* (1984), 104 Ill. 2d 463; *People v. Albanese* (1984), 102 Ill. 2d 54; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.) Defendant argues that our death penalty is unconstitutional because it does not require a finding that death is an appropriate penalty. The point is not argued in the brief, which simply states, "in the interest of judicial economy, for the reasons set forth in appellant's brief in *People v. Hope,* docket no. 58037" the sentence of death should be vacated. We wish to advise that this is not a proper manner in which to raise an issue to be considered by this court. This case was taken under advisement before People v. Hope was fully briefed and argued. It appears the issue which defendant attempts to raise has been considered by this court and decided adversely to the defendant's contention in *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445. We will not further consider this issue here.

The defendant also raises two other issues which "in the interest of judicial economy" were not briefed, but defendant refers to the brief filed in People v. Bean, No. 56448. Here, also, People v. Bean has not been argued before the court. Also, this case has not been fully briefed as yet. We again point out that this is not a proper manner in which to raise issues in this court. The first issue lifted

from the Bean brief urges that our death penalty statute is unconstitutional because it lacks procedures to ensure adequate appellate review. This argument is based on some language contained in *Pulley v. Harris* and is but another twist of the argument that other defendants have urged in this court growing out of the concept of "proportionality review." In *People v. Del Vecchio* this court stated that *Pulley v. Harris* imposed no requirement not met by our present method of review. *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 444.

The other issue lifted from the brief filed in Bean urges that our statute is unconstitutional because it provides no means of assuring that all aggravating factors relied upon by the sentencing body were relevant or constitutionally permissible. In reviewing death penalty cases this court considers the entire record. We have vacated the sentence of death where improper aggravating factors have been considered. (See *People v. Brownell* (1980), 79 Ill. 2d 508, 535-36.) In view of the nature of our review of death penalty cases, we will not hold our statute unconstitutional for the reason urged. In *Barclay v. Florida* (1983), 463 U.S. 939, 77 L. Ed. 2d 1134, 103 S. Ct. 3418, the Supreme Court held that the sentencer's reliance on a nonstatutory aggravating factor did not violate the Constitution because the information was relevant. "[A]s long as that information is relevant to the character of the defendant or the circumstances of the crime," it may be considered. (463 U.S. 939, 967, 77 L. Ed. 2d 1134, 1154, 103 S. Ct. 3418, 3433 (Stevens, J. concurring, joined by Powell, J.).) The defendant has not urged that any evidence in this case relates to aggravating factors that are not relevant. If the defendant were to present such an argument we would consider whether the sentence should be vacated on the basis of relevancy of the evidence admitted. It would not be necessary to hold the statute unconstitutional simply because some irrelevant evidence may have been admitted.

This argument is but another version of the contention that consideration of nonstatutory aggravating factors results in an arbitrary and capricious. imposition of the death penalty. We have rejected this argument many times. See *People v. Stewart* (1984), 105 Ill. 2d 22, 75; *People v. Gacy* (1984), 103 Ill. 2d 1, 103-04; *People v. Owens* (1984), 102 Ill. 2d 145, 159; *People v. Albanese* (1984), 102 Ill. 2d 54, 82.

For the reasons set forth above, defendant's conviction and sentence for murder is affirmed. The clerk of this court is directed to enter an order setting Thursday, November 14, 1985, as the date on which the sentence of death, entered in the circuit court of Will County, is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

Due to a number of errors during all phases of the trial and sentencing hearing in this case, I would reverse both the defendant's death sentence and his conviction of murder.

First, the trial court erred by refusing to give the defendant's requested instruction for aggravated battery. The majority misreads the record when it states that the evidence "precluded any possibility of the jury finding defendant guilty of aggravated battery" on either a direct-responsibility or accountability theory of murder (108 Ill. 2d at 83).

On a direct-responsibility theory, there is sufficient evi-

dence in the record for the jury to conclude that the defendant did not strike the fatal blow, and therefore that he is not guilty of murder. At the same time, the jury could conclude on the evidence that the defendant stabbed Cook at least once, and that therefore he is guilty of aggravated battery. Under these circumstances, *Beck v. Alabama* (1980), 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382, requires that an instruction for the lesser offense of aggravated battery be given, in order to prevent the jury from mistakenly convicting the defendant of murder simply because it realizes that the defendant must have committed some crime for which he should not go unpunished.

None of the witnesses actually saw anyone stab Cook. Anthony Beamon, the only eyewitness to the attack who testified, stated that the defendant swung his arm down toward Cook from overhead. Dr. Edward Shalgos, a prosecution witness, testified that the fatal wound could not have been produced from an upward direction unless the victim was lying down when he was stabbed; Beamon testified that Cook was standing. The majority emphasizes Dr. Shalgos' statement that the defendant's homemade knife was "most highly compatible" with the fatal wound, as if this phrase meant that it was most likely that the knife caused the wound. However, the jury could have understood that phrase as I do, to mean that while the knife was not fully compatible with any of the wounds, of the four, it was "most" highly compatible with the fatal wound. Dr. Shalgos could not state with certainty that a particular knife caused a particular wound, and the record indicates that not all the knives used in the attack were recovered.

Considering all the evidence, the jury could have concluded that this defendant did not cause the fatal wound, but that he might have caused one of the other three wounds. Considering only the direct-responsibility theory of murder, there can be no doubt that the defendant was entitled to an aggravated-battery instruction.

Turning next to the accountability theory, the jury still could have found that the defendant committed an aggravated battery, but did not commit murder, in which case the defendant was entitled to the aggravated-battery instruction. It was the jury's duty to weigh the conflicting evidence and then to determine whether the defendant was legally accountable for the actions of others.

The majority accepts as fact the premises that the defendant stabbed Cook at least once, and that, therefore, because he aided or abetted a murder, the only crime for which he could properly be found guilty was murder. This is incorrect for several reasons.

First, the jury could have chosen to disbelieve Beamon's testimony insofar as it conflicted with other evidence. Beamon is a convicted felon who had been transferred to another correctional institution, presumably in return for his favorable testimony. Second, the majority relies on investigator William Price's testimony regarding statements which the defendant made to him. The two statements are contradictory, and based upon one of the statements, the defendant's participation might be construed as not aiding or abetting murder. The majority does not point out the inconsistencies in the two statements, the dispute over whether the defendant gave a written statement or initialed papers prepared by Price, or the defendant's considerable difficulty with the English language. At one point in the pretrial proceedings the court appointed an interpreter; even after that arrangement was terminated, the defendant received translation assistance. All of this affects the believability of investigator Price's testimony and the credibility of the alleged admissions. Finally, the Illinois cases, including those cited by the majority (108 Ill. 2d at 83), hold only that voluntary actions *can* support conviction of a crime on an accountability theory. No Illinois case holds that a defendant who acts independently *must* be found guilty of crimes committed by others. The distinction is

critical where, as here, the defendant is entitled to an instruction on a lesser offense so long as the jury *could,* on the basis of the evidence, find him guilty of the lesser crime and not guilty of the greater.

*Hopper v. Evans* (1982), 456 U.S. 605, 72 L. Ed. 2d 367, 102 S. Ct. 2049, on which the majority relies to hold that the defendant here is not entitled to an aggravated-battery instruction, is inapposite. In *Hopper* the defendant pleaded guilty, admitted the crime, said that he would return to a life of crime if released, and asked the jury to return a positive verdict for the State. He had previously made similar statements to the grand jury and also asked the grand jury that he be executed as quickly as possible. Under these circumstances the Supreme Court refused to order a new trial, despite its earlier invalidation of an Alabama law which precluded instructions on lesser offenses in capital cases. *Hopper* does not control this case where the defendant contested his guilt and where the evidence would support a finding of not guilty of murder on either a direct-responsibility or accountability theory. This case is controlled instead by *Beck v. Alabama,* which holds that in a capital case where the jury may believe that the defendant is clearly guilty of some crime, the jury must be offered the alternative of conviction of the lesser offense. Neither *Beck* nor any Illinois case stands for the proposition that to be entitled to an instruction on a lesser charge, the burden is on the defendant to establish that there was insufficient evidence to support the greater charge.

Finally, the Illinois cases cited by the majority (*People v. Lockett* (1980), 82 Ill. 2d 546; *People v. Simpson* (1978), 74 Ill. 2d 497; *People v. Pokosa* (1930), 342 Ill. 404) do not stand for the proposition for which they are cited. These three cases hold more narrowly that the defendant in a murder case is not entitled to a voluntary-manslaughter instruction when there is no evidence to support a manslaughter conviction. In other words, because voluntary

manslaughter is technically an included offense of murder, the evidence in every case does not necessarily prove the elements of both crimes. Those cases also differ from this one because the mental states which support murder and voluntary-manslaughter convictions differ.

Assuming, *arguendo,* that the murder conviction was proper in this case, there were a number of errors in both phases of the sentencing hearing which require that the death sentence be vacated. During the first phase of the sentencing hearing, the State proved the defendant's age by calling as a witness a police officer who had earlier arrested the defendant on an unrelated armed-robbery charge. The defendant's age could easily have been proved by documentary evidence, by his own testimony, or even by the testimony of prison officials connected with the events in this case. The technique which was used was unnecessary and prejudicial. It served only to bias the jury against the defendant because of his prior bad acts. During this phase, the State needed only to prove that the defendant was at least 18 years old. The rest was reversible error.

Also during the first phase of the penalty hearing, the circuit judge sustained the State's objection to the defendant's argument that he may not have been the one who inflicted the fatal wound. This ruling was prejudicial. Although the jury convicted the defendant of murder during the guilt phase, there was no special verdict indicating whether he was found guilty on a direct-responsibility theory or on accountability. The argument which the circuit judge disallowed was a proper and relevant one in this case.

The majority rejects the defendant's argument that the death penalty in his case is invalid as disproportionate because other inmates convicted of participation in the crime did not receive death sentences. As already pointed out, the defendant may have been convicted on an accountability theory. The degree of his participation is a proper miti-

gating factor which may be considered during the second phase of the sentencing hearing. Whether or not the death penalty is disproportionate because it is imposed in some murder cases and not others, the situation here is narrower. It is impossible to determine from the jury verdicts which of the convicted individuals is most culpable. It is unconscionable that one of these men may forfeit his life while the possibility remains that another who inflicted the fatal wound, or who planned the deadly assault, will live. Such administration of "justice" appears truly random. It may result not only in an irremediable error with respect to this defendant, but also in an erosion of public confidence in our ability to ferret out the truth and to tailor the punishment to the crime.

Moreover, the majority fails to consider the defendant's claim that, as a matter of State law, his death sentence was unjustly disproportionate when compared with one of his codefendants, Hector Rivera. It is a well-settled principle in this State that "[a]n arbitrary and unreasonable disparity between the sentences of codefendants who are similarly situated, of course, cannot be defended." (*People v. Godinez* (1982), 91 Ill. 2d 47, 55; see also *People v. Szabo* (1983), 94 Ill. 2d 327, 351-53.) The defendant and Hector Rivera both stabbed the deceased. Rivera, however, was already serving a sentence for a prior murder in which he killed a 14-year-old boy with a baseball bat. The defendant was serving the minimum sentence for armed robbery. Even if the defendant was a participant in a plan to attack Cook, his conduct was no more culpable than his codefendants who did not receive death sentences, and his sentence, therefore, should be vacated and the cause should be remanded for imposition of an appropriate sentence.

In addition the verdict in this case must be reversed in view of the recent Supreme Court decision in *Caldwell v. Mississippi* (1985), 472 U.S. ____, 86 L. Ed. 2d 231, 105 S. Ct. 2633. Like the jury in *Caldwell*, the jury in this case

could have believed that "the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (472 U.S. ___, ___, 86 L. Ed. 2d 231, 239, 105 S. Ct. 2633, 2639.) The defense attorney, the prosecutor, and the judge all used the word "recommend." The only relevant dictionary meaning of "recommend" which fits this context is "to advise; counsel; suggest." (Webster's New World Dictionary of the American Language 1187 (2d College ed. 1976).) We must assume that the jurors understood the word to have its ordinary meaning, since they were not instructed otherwise. If they believed that they were only providing advice, suggestions, or counsel, they could easily have believed that the judge or a later reviewing court would make the final decision regarding the death penalty.

I do not agree with the majority's conclusion that the problem was obviated by an instruction which stated that "the court must sentence the defendant to death" and a written verdict form signed by the jurors stating that "the court shall sentence him to death." In view of the jurors having heard the word "recommend" repeatedly during the *voir dire*, as well as three times during the sentencing hearing, there is no way of knowing how they reconciled the instruction they received and the verdict they signed with what they had been told earlier in the trial. Jurors in *Caldwell* also heard accurate instructions covering their sentencing duties (472 U.S. ___, ___, 86 L. Ed. 2d 231, 249, 105 S. Ct. 2633, 2647 (Rehnquist, J., dissenting, joined by Burger, C.J., and White, J.)), but those were not sufficient to undo the effects of the prosecutor's erroneous statements. As in *Caldwell*, when the jurors deliberated in this case they had inconsistent information.

The majority suggests that since the defense counsel himself used the term "recommend" during *voir dire*, this issue is waived. The fact that the defense attorney himself used the word "recommend" only serves to exacerbate

rather than diminish the problem. Everyone involved—defense counsel, prosecutor, and the judge—said "recommend." The use of this common English word by both adversaries, as well as by the judge who was supposed to represent the neutral authority vested in the court, could only give the impression that everyone, no matter what his stake in the outcome of the case, believed that all the jury would do is "recommend" the penalty to be imposed. This situation is directly parallel to *Caldwell*, where the words and actions of both the prosecutor and trial judge helped create the impression that the jury's sentencing action was not final. All counsel in this case, as well as the trial judge, either overlooked the misleading impression the jury was being given or misunderstood the law which was explained in *Caldwell*. For that reason, and particularly because this is a death case, I regard it as inappropriate to refuse to apply the plain-error doctrine provided for by our Rule 615(a) (87 Ill. 2d R. 615(a)). See *People v. Jones* (1982), 94 Ill. 2d 275, 294-95.

I further believe that the application of the death penalty in this case is unconstitutional because of the possibility that this defendant's comprehension of the English language was so poor that he could not participate effectively in his defense and could not comprehend the gravity of the penalty imposed. The record reveals that one defense attorney withdrew from the case because he could not communicate with his client. Again, fundamental fairness to the defendant and public confidence in the administration of justice dictate that the ultimate sanction not be imposed in a situation as clouded by doubt as this one.

Finally, for the reasons stated in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that

the Illinois death penalty statute is unconstitutional, and that therefore the death sentence should be vacated and the cause remanded for a new sentencing hearing. For all these reasons, I dissent.